WESTSTEYN DAIRY 2,
et al., Plaintiffs,

v.

EADES COMMODITIES CO., Diversified Business Credit Inc., and Does 1 through 100, inclusive, Defendants.

Willy Creek Ranch, a California Corporation, Plaintiff,

v.

Eades Commodities Company; Diversified Business Credit, Inc., et al. Defendants.

No. CIV–F–00–71470WWDLB.

United States District Court,
E.D. California.

May 7, 2003.

Fred A Silva, Damrell Nelson Schrimp Pallious Pacher and Silva, Modesto, CA, for Weststeyn Dairy 2, Joe Alamo, B & J Dairy, george TeVelde, J & M Bettencourt & Sons Dairy, Larrybell & Son Dairy, Bob Marchy, Sleepy Hollow Certified Milk Co., Tony Garcia, Case Van Steyn, Bruce Burroughs, George Plantenga.

Clinton Paul Walker, Damrell Nelson Schrimp Pallious Pacher and Silva, Modesto, CA, for Van Warmerdam Dairy Inc.

Shanti Renee Patching, Herum Crabtree Brown, Stockton, CA, for Willy Creek Ranch.

L Burda Gilbert, Weintraub Genshlea Chediak Sproul, Sacramento, CA, for Eades Commodities Co.

Alain M Baudry, Pro Hac Vice, Maslon Edelman Borman and Brand, Minneapolis, MN, Stephen Roy Cornwell, Cornwell and Sample, Fresno, CA, for Diversified Business Credit Inc.

## MEMORANDUM AND ORDER RE: DEFENDANT DIVERSIFIED'S MOTION FOR SUMMARY JUDGMENT

WANGER, District Judge.

### I. INTRODUCTION

Plaintiffs are fourteen dairy farms: Weststeyn Dairy 2; Joe Alamo, individually and dba Alamo Dairy; B & J Dairy; George TeVelde, individually and dba George TeVelde Dairy Farm; J & M Bettencourt & Sons Dairy; Larrybell & Son Dairy; Bob Marchy, individually and dba Marchy Dairy; Sleepy Hollow Certified Milk Co., a California corporation; Tony Garcia, individually and dba Tony Garcia Dairy; Case Van Steyn, individually and dba Van Steyn Dairy; Bruce Burroughs, individually and dba Vista Livestock Co.; George Plantenga, individually and dba Western Sky Dairy; Van Warmerdam Dairy, Inc., a California Corporation and Willy Creek Ranch. Thirteen dairies (hereinafter "Weststeyn") with the exception of Willy Creek Ranch filed their complaint in state court on November 7, 2000. The case was removed by defendant Diversified Business Credit ("Diversified") with the consent of defendant Eades Commodi-

ties Company ("Eades") to the United States District Court of the Eastern District of California, Sacramento Division on December 8, 2000. On December 19, 2000, Judge Shubb transferred the case to the Fresno Division pursuant to Local Rule 3–120(b). Plaintiff Willy Creek Ranch ("Willy Creek") filed its complaint in federal court on August 10, 2001. The cases were consolidated on November 26, 2001.

Plaintiffs sue Diversified and Eades on various claims arising out of the loss of approximately $1.1 million prepaid to Eades for cattle feed and subsequently taken by Eades' primary lender, Diversified, to enforce its security interest in Eades' accounts receivable or general intangibles. Plaintiffs allege conversion, unjust enrichment, intentional interference with contractual relations, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and declaratory relief. Diversified moved for summary judgment on April 15, 2002, and revised its supporting memorandum of law on June 10, 2002. Willy Creek filed a separate opposition on June 24, 2002. Weststeyn filed a separate opposition on June 24, 2002, and also adopted and incorporated all of Willy Creek's legal arguments and objections. Oral argument was heard on September 23, 2002.

## II. *STATEMENT OF FACTS*

*Undisputed Facts.*

In 1989, Diversified, a Minnesota commercial lender, entered into a revolving line of credit agreement with Eades, a Nebraska cattle feed merchant. Walter Tomaszek Decl., Apr. 15, 2002, ¶ 2. Diversified secured its financing to Eades through a Credit and Security Agreement ("Security Agreement") dated November 22, 1989, by which it took perfected security interests in Eades' assets. *Id.* at ¶ 3 & Ex. A. Under Paragraph 3(a) of the Secu-

rity Agreement, Eades granted Diversified a security interest in its inventory, documents of title, accounts receivable, equipment and fixtures, equity securities, general intangibles, and all proceeds and products, all defined as "Collateral." *Id.* Paragraph 3(A) of the Security Agreement provides in pertinent part:

*Grant of Security Interest.* Borrower hereby assigns to Lender and grants Lender a security interest (collectively referred to as the "Security Interests") in the property described below, as security for the payment and performance of each and every debt, liability and obligation of every type hereafter owed to Lender ... The Security Interests shall attach to the following property of Borrower (the "Collateral"), including all proceeds and products thereof:

. . . .

RECEIVABLES: Each and every right of Borrower to the payment of money, whether such right to payment exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property, out of a rendering of services, out of a loan, out of overpayment of taxes or other liabilities, or other transaction or event, whether such right to payment is created, generated or earned by Borrower or by some other person whose interest is subsequently transferred to Borrower, *whether such right is or is not already earned by performance,* and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens, security interests and guaranties) which Borrower may at any time have by law or agreement against any account debtor or other person obligated to make any such payment or against any property of such account papers, bonds, notes and other debt instruments, and all rights to payment in the nature of

general intangibles; all checking accounts, savings accounts and other certificates of depository accounts and all savings certificates and certificates of deposit maintained with or issued by Lender or any other bank or other financial institution.

. . .

GENERAL INTANGIBLES: All general intangibles of every type and description now owned or hereafter acquired by Borrower, including (without limitation) all present and future foreign and domestic patents, patent applications, trademarks, trademark applications, copyrights, trade names, trade secrets, shop drawings, engineering manuals, operating instructions, customer or supplier lists and contracts, licenses, permits, franchises, the right to use Borrower's corporate name, and the goodwill of Borrower's business.

Ex. A, ¶ 3(a) (emphasis added). Eades agreed "to deposit in one or more special collateral accounts maintained for Lender at Firstier Bank, Omaha, Nebraska, or any other bank reasonably satisfactory to Lender and Borrower, all collections on accounts, contract rights, chattel paper and other rights to payment constituting Collateral, and all other cash proceeds of collateral, immediately upon receipt thereof, in the form received, except for Borrower's endorsement when deemed necessary." *Id.* at ¶ 3(c). The Security Agreement specified that "[e]xcept to the extent otherwise required by law, this Agreement and the transactions evidenced hereby shall be governed by the substantive laws of the State in which this Agreement is accepted by Lender." *Id.* at ¶ 13. Diversified filed a financing statement with the Nebraska Secretary of State on November 27, 1989 to perfect its security interest and preserved its perfected status by filing a continuation statement on October 25, 1999. Tomasz-

ek Decl. at ¶ 5. As of all the transactions in dispute, Diversified held a valid and perfected security interest of record in California in all Eades' receivables and general intangibles.

Prior to March 2000, Eades supplied grain feed to dairies and other cattle operations throughout California, including Plaintiffs. Plaintiffs purchased cattle feed from Eades', sometimes dealing with Eades directly, but most of the time dealing through brokers Wes Creswick and Stan Lawrence of Feed Services Company, Eades' California agents. Eades offered a prepay program to provide customers an incentive to prepay for cattle feed. Customers who prepaid could get a discount of $2 a ton off the price of the commodity; alternatively, they could earn interest on their prepaid balance at the rate of 7% per year. Eades Dep. at 12:12–23, Ex. 5. The prepay program allowed Eades' customers to prepay at the end of one year for feed to be delivered in the following year. A tax deduction was taken by the buyer for the full amount of the purchase, including for undelivered feed. As feed was needed throughout the following year, Eades shipped feed and the prepay deposit balance was reduced.

The contract of sale confirmation between each plaintiff and Eades called for delivery of a fixed amount of grain over a specified period of time at a fixed price, with certain terms and conditions specified on the reverse side of the contract. Eades Dep. at 6, Ex. 1 at 2. The sales agreement specified that "salesmen and brokers are not empowered to give contracts to bind the Seller." An integration clause provided:

This contract constitutes the entire understanding between the parties hereto and no modification or amendment of this Contract shall be valid or binding unless agreed to by both parties and

confirmed in writing by either parties to the other. THERE ARE NO ORAL AGREEMENTS OR WARRANTIES COLLATERAL TO BE AFFECTING THIS CONTRACT. Buyer agrees to be bound by the terms of this Contract in the event of any conflict in terms or conditions hereof with Buyer's contract for such purchase.

*Id.*

*Plaintiffs' Contract Dealings With Eades*

1. *Alamo Dairy*

Plaintiff Joe Alamo dba Alamo Dairy prepaid Eades for feed in 1999. Alamo Dairy took an expense deduction from income for tax purposes for the full amount of a prepayment in the year the contract was formed on the advice of its accountant. Joe Alamo Dep. at 14. Mr. Joe Alamo was primarily responsible for the dairy's business dealings with Eades. Mr. Alamo testified he only spoke with Wes Creswick, who acted as a broker for Eades. *Id.* at 17, 20. Mr. Alamo testified regarding his conversations with Mr. Creswick:

Q: Did Mr. Creswick or any—or anybody else from Feed Services Company, did they ever tell you that your prepayment moneys would be held in trust?

A: Yes. I believe I recall a conversation with Wes about that.

Q: Did Wes use that specific language?

A: Correct.

Q: Okay. When did Wes tell you that your prepayments would be held in trust?

A: I believe in March—it was after you guys had already had—it was after Eades bankruptcy, so-called bankruptcy, that he had said that Bob Eades had told him that our moneys were held in trust. And that's about the extent of the conversation.

Q: But prior to that I take it Mr. Creswick never said the moneys would be held in trust; is that correct?

A: Correct.

Q: Did Mr. Creswick ever tell you that your prepayments would be segregated and held in a separate account at A.G. Edwards or any other financial institution?

A: Not that I can recall.

Q: And did he ever tell you what would be done with your money once it was received?

A: No.

Q: Did he ever promise you that it wouldn't be used to pay other business expenses of Eades?

A: No.

Q: When you made the prepayments to Eades that you did at the close of '99, were you concerned at all abut the risk of paying that money in advance?

A: At that time, no.

*Id.* at 18–19.

This testimony establishes that the subject of a trust did not arise until after the dispute arose, not when any contract was formed.

2. *Vista Livestock*

Plaintiff Bruce Burroughs dba Vista Livestock prepaid Eades for cattle feed from 1995 until 1999. Burroughs Dep. at 21. Vista Livestock dealt with Mr. Stan Lawrence, never directly with Eades. *Id.* at 20. As a matter of general business practice, it was Vista Livestock's practice to deduct the full amount of the prepayments in the year the contract was made. *Id.* at 30. Besides the tax benefit of prepaying the current tax year for goods delivered, prepaying in advance permitted Vista Livestock to lock in a fixed per ton

price for feed and a guaranteed quantity for the following year. *Id.* at 31. Vista Livestock selected the price discount rather than the seven percent interest and received a discount of $3 per ton. *Id.* at 32–33. Mr. Bruce Burroughs, who was primarily responsible for the dairy's business dealings with Eades, testified as to his relationship with Eades:

Q: Okay. Did you and Mr. Lawrence ever discuss what would be done with your money once it was prepaid?

A: No.

Q: And did you ever discuss that subject with Bob Eades, Bob March, or anyone else from Eades Commodities?

A: No.

Q: So no one told you that your money would be held in trust; is that correct?

A: Yes, that is correct.

Q: Okay. That's something that you assumed?

A: Yes.

Q: And no one told you that the prepay money that you—the prepays that you made at the close of '99 would not be used to pay Eades' other business expenses; is that correct?

A: No one—no one told us so, yes.

. . .

Q: Okay. And no one told you that the money that you prepaid would be segregated or held in a separate account? That's something that you assumed; is that correct?

A: Yes.

Q: Did anyone from Eades or Mr. Lawrence tell you or anyone else ever discuss an A.G. Edwards account or tell you that your money was deposited with A.G. Edwards?

A: No.

*Id.* at 45–46.

This testimony establishes a trust was never discussed and no such agreement was formed. Tax deductions were taken for prepayments. A price discount was taken in lieu of interest on prepayments.

### 3. *Tony Garcia Dairy*

Plaintiff Tony Garcia dba Tony Garcia Dairy first prepaid Eades for feed in 1999 primarily for tax reasons. Tony Garcia Dep. at 10–11. Tony Garcia Dairy received seven percent interest on the prepaid balance. *Id.* at 21–22. Mr. Tony Garcia, who was principally responsible for running the Tony Garcia Dairy, testified he dealt with Eades through Mr. Stan Lawrence. *Id.* at 11, 30. Mr. Garcia testified regarding his discussions with Mr. Lawrence:

Q: Now, did you and Mr. Stan Lawrence ever discuss the subject of prepays?

A: Yes.

Q: Okay. And what would he tell you about the prepays?

A: Well, he told me about the interest.

Q: Okay.

A: And that's basically it. Everything else is, I think, common knowledge as far as what the reason for prepayment is in the industry.

Q: Okay. Did Stan Lawrence, Bob Eades or anyone ever tell you that the money that you prepaid would be held in trust? Anyone ever tell you that?

A: No detail of that.

Q: Okay. Did they ever promise you that it wouldn't be used to pay other business expenses?

A: No.

Q: Did they ever tell you that the moneys would be segregated or held in a separate account with A.G. Edwards or any other financial institution?

A: No.

*Id.* at 30.

No trust was ever discussed or formed.

4. *Sleepy Hollow Certified Milk Co.*

Plaintiff Sleepy Hollow Certified Milk Co., entered into a contract of sale with Eades for feed to be delivered between October 1999 through September of 2000. Max Herzog Dep. at 10. The contract was a fixed price prior to the prepay. *Id.* at 13. Sleepy Hollow Dairy prepaid Eades for cattle feed at the close of 1999. *Id.* at 12. Max Herzog, who was principally responsible for Sleepy Hollow's business dealings with Eades, testified regarding his interactions with Eades and Mr. Stan Lawrence:

Q: Who did you speak with from Eades Commodities?

A: Approximately four years ago the owner Bob Eades stopped by just to meet me, just to talk general terms prior to the first year that I made prepayment, which would have been in 1998.

Q: Uh-huh.

A: One of their program brochures or the papers they sent out they told us to contact a Bob March -

Q: Uh-huh.

A: with his phone number and his extension. I called and discussed their program with him.

Q: Are those—were those the only two occasions that you communicated with anybody from Eades Commodities, four years ago and then once in '98 with Bob March?

A: That four years ago was approximate. I don't have that exact date,

but I know I called Bob March in '98 concerning 1999.

Q: Okay. Do you recall any other conversations with anybody from Eades?

A: No.

Q: Now, the conversation that you had with Bob Eades, did you discuss prepayments with him?

A: Not to the best of my knowledge.

Q: And how about the conversation that you had with Mr. March in '98?

A: Definitely.

Q: Okay. And could you tell me in a little bit more detail what was discussed?

A: I called and asked him about the program.

Q: Uh-huh.

A: He explained it to me and said that these funds would be going into a trust and would not be an invoice for an expense until the feed was delivered.

Q: Is that something he just gratuitously told you, or did you ask him about that?

A: I asked.

Q: And did he use that specific word "trust"?

A: I don't remember the specific word, but it was certainly implied that they were going into a trust.

Q: Do you recall what he said that led you to believe that?

A: I do not.

Q: Did he tell you that the moneys that you—or the prepayments that you made, did he tell you they'd be segregated and held in a separate trust account with A.G. Edwards or any other financial institution?

A: I don't recall the exact words that he used. I have a note here that has a name on it A.G. Edwards, but I don't know how it was used.

. . .

Q: Mr. Herzog, I believe when we left off we were discussing the communications that you've had with Eades and we started out talking about the communications that you had directly with personnel from Eades, either Bob Eades or Bob March. Do you recall that?

A: Yes.

Q: I'd like to move on and talk a little about the communications that you had through your broker. Were you—were you dealing with Eades also through Stan Lawrence?

A: Yes.

Q: Okay. How about a gentleman by the name of Wes Creswick? Did you have discussions with him as well?

A: Very seldom, only when Stan Lawrence was not available.

Q: Okay. And did he ever tell you that your prepayments that you made would be held in trust?

A: Yes.

Q: And when did Mr. Lawrence tell you that?

A: Is there a date on that? It looks like March the 1st of 2000.

Q: And was that the first time that he said that to you?

A: I believe so.

Q: Did he ever tell you that your prepayments would be held in a segregated account with A.G. Edwards or any other financial institution?

A: I don't believe so.

Q: Did he ever promise that the prepayments wouldn't be used to pay other business expenses of Eades?

A: Not directly. I assumed if they were in trust, they would not be.

Q: Did you ever talk to anybody from A.G. Edwards?

A: No.

*Id.* at 19–22.

Although the subject of a trust was discussed, the term was not used until March 2000. The witness "assumed" the funds "were going into a trust," however, a segregated account was not discussed.

5. *Willy Creek Ranch*

Plaintiff Willy Creek Ranch did business with Eades in 1995, if not 1994. Jeffrey Jongsma Dep. at 13. Willy Creek made prepayments to Eades since 1995. *Id.* at 18. Willy Creek earned seven percent interest on the prepay balance. *Id.* at 32. Mr. Jeffrey Jongsma, who was responsible for Willy Creek's business dealings with Eades, testified there were verbal agreements in addition to the written contracts entered into with Eades for delivery of feed into 2000:

Q: Are the other contracts other than these that are not in this stack that dealt with delivery for feed into 2000?

A: Well, there was verbal agreements.

Q: Okay. And what sort of verbal agreements did you have with Eades?

A: Well, I give—I'd give him refundable deposit so I'd have the opportunity to purchase feed from him in the—in the future and probably the present.

Q: And when did you reach an agreement with Eades that the deposit as you characterized it and that you made with him were refundable?

A: I believe in December.

Q: All right. Did you have a specific conversation with Mr. Eades?

A: Yes, I had a conversation with him.

Q: Okay. And do you remember the date of that conversation?

A: No I couldn't—I don't know at this time.

Q: Did you call him or did he call you?

A: I believe we called each other.

Q: Who placed the call?

A: We would each place calls to each other.

Q: Did Mr. Eades use the word "refundable deposit" when he spoke with you?

A: Yes, I believe so.

Q: As I understood it, then, the money that you deposited with him, that would be like a deposit in a bank?

. . .

A: I would say its's basically the same thing.

*Id.* at 15–17. Mr. Jongsma also testified regarding whether the prepayments were held in trust and segregated:

Q: Did they ever tell you that they'd hold your prepayment money in trust?

A: Those exact words, I don't believe so.

Q: Did they ever tell you what they would do with your money once it was received?

A: Yes.

Q: And what did they tell you?

A: They told me that they—it would be deposited—a refundable deposit, and they would only take money out of it once I received feed for it. That was Bob Eades, not Bob March.

Q: Did they promise that it wouldn't be used to pay other business expenses?

A: I don't recall that.

Q: Did they ever tell you that the money would be segregated in a separate account with a financial institution?

A: I don't recall that either.

Q: Did you ever discuss an A.G. Edwards account or tell you that your money would be deposited in A.G. Edwards?

A: I never discussed A.G. Edwards.

Q: As far as you know was your money ever deposited with A.G. Edwards?

A: I don't recall. I don't—as far as I know, no.

. . .

Q: Sure. Did Stan Lawrence or Wes Creswick or anybody else from Feed Services ever tell you that they would hold your prepayment money in trust?

A: I—that Feed Services would hold the money in trust?

Q: That either Feed Services or Eades would hold the money in trust?

A: I don't believe—I don't—I don't recall at this time if they did or not.

Q: Okay. Did Mr. Lawrence, Mr. Creswick or anybody else from Feed Services ever tell you what would happen to your prepayment money once you made those prepayments?

A: Not that I recall.

Q: Okay. Did they ever tell you that the prepayment moneys would be segregated in a separate account with A.G. Edwards or any other financial institution?

A: Not Stan Lawrence and certainly not Wes Creswick.

*Id.* at 38–41.

Mr. Jongsma was not told Willy Creek Ranch funds would be held in trust or would not be commingled with Eades' gen-

eral funds. He understood Willy Creek placed "refundable deposits" with Eades that were not earmarked, not segregated, and placed at risk dependent upon Eades' financial ability. The payment of interest on the deposit reflected a repayment obligation as opposed to a trust.

### 6. *Larrybell Dairy & Sons*

Plaintiff Larrybell Dairy & Sons made prepayments to Eades six to eight years ago. Larry Lawrence Dep. at 22, 37. Larry Lawrence, the co-owner and person responsible for Larrybell Dairy's business dealings with Eades Commodities, testified he purchased feed from Eades through Stan Lawrence. *Id.* at 10, 17. Mr. Lawrence hand-delivered the prepayment checks to Stan Lawrence. *Id.* at 25. Mr. Lawrence acknowledged the prepayments benefitted Larrybell Dairy through a tax deduction, a fixed price per ton, and a good interest rate on the prepayment. *Id.* at 30–34. Mr. Larry Lawrence communicated with Eades through Mr. Stan Lawrence regarding the prepayments. *Id.* at 42.

Q: So other than the December 27th, 1999 luncheon, do you recall any other specific conversations or exchange of letters or email and the like with Mr. Eades or anybody else from Eades Commodities?

A: Every year in December he'd give us a Christmas dinner and give us wine and sweet talk us into doing this. The same thing every year. It was nothing new in '99. We did it every year, I think, since Eades was in this area.

Q: And how about Mr. Lawrence? Did you ever discuss the topic of prepays with Mr. Lawrence?

A: Yes, sir.

Q: Stan Lawrence, that is?

A: Yes, sir.

Q: And what would Mr.—excuse me. What would Stan Lawrence say to you about the prepayments?

A: What would he say to me?

Q: Yeah.

A: He would ask me if I planned on doing any prepaying toward the end of the years. Every year—he'd asked me if I had any plans to do any prepaying that particular year so he could come over and I could issue him a check and he would take it in.

Q: Did Bob Eades, Stan Lawrence or anybody else ever tell you that the money that you prepaid would be held in trust?

A: That was my understanding. My money was my money, just like— that's why I am getting seven percent interest because my money is in the holding account where I can get my interest back every month. As the invoices come in, it would be deducted off of my moneys in the bank.

Q: Did Bob Eades, Stan Lawrence or anyone else tell you specifically that your money would be held in a segregated account or a holding account with A.G. Edwards or any other financial institution?

A: With A.G. Edwards, no.

*Id.* at 42–44. Mr. Lawrence testified Larrybell Dairy requested a letter of credit the first year it began doing business with Eades but decided not to obtain a letter of credit in the subsequent years. *Id.* at 39.

Q: Why did you decide after this year not to obtain any further letters of credit in connection with your business dealings with Eades Commodities Company?

A: First off, you'll notice it's April. It takes a while to get this thing

from—I'm sure I requested it in December or January. It takes awhile, and it costs money. I took a gamble that I wouldn't need it. I lost.

*Id.* at 41.

Mr. Lawrence's testimony does not evidence any express or implied promise to hold Larrybell's funds in trust, not to commingle the prepayments, or to segregate the funds. Rather, Larrybell recognized the risk in the first year by obtaining a letter of credit. It assumed the risk of Eades' financial inability by voluntarily electing not to secure its prepayments by a letter of credit. Expense deductions for the full prepayments evidence a sale and account receivable to Eades not fully earned by performance. Interest was paid on prepayments.

### 7. *Marchy & Sons Dairy*

Plaintiff Marchy & Sons Dairy made prepayments to Eades only in 1999. Robert Marchy Dep. at 10. Mr. Robert Marchy, a co-owner and person responsible for the dairy's business dealings with Eades, stated he placed orders for feed through Wes Creswick as the dairy's broker. *Id.* at 11. Mr. Marchy never spoke with Mr. Eades or Mr. Bob March. *Id.* at 17. He testified the dairy prepaid to deduct the prepayments on his tax returns for 1999, to obtain interest on the prepayments and to lock in an assured quantity. *Id.* at 13–14. Mr. Marchy testified as to his discussions with Mr. Creswick regarding whether the prepayments would be held in trust:

Q: Okay. Did Mr. Creswick or anybody else from Feed Services tell you that the prepayments that you made would be held in trust?

A: Yes.

Q: Okay. When did—or who told you that they would be held in trust?

A: Wes.

Q: And did he use that specific word "trust"?

A: Yes.

Q: And when did—when did he first tell you that?

A: When I was first striking the deal with him just prior to 1999—or the last week of '99, and then he sent me a letter when we had found out that Eades was going insolvent.

Q: Would that have been—that would have been a letter you would have received in March of 2000?

A: Yes. I believe it was around March. I can't quite remember the date.

. . .

Q: Other than that letter that you received in March, is there any other previous written correspondence to the effect that your money would be held in trust?

A: No, I don't believe so.

Q: Did Mr. Creswick or anybody else from Feed Services ever tell you that your prepayments would be segregated or held in separate account with A.G. Edwards or any other financial institution?

A: No.

Q: Did you ever get any statements showing where your money was?

A: No.

Q: Do you recall when Mr. Creswick told you that your prepayments would be held in trust?

A: Yes. It was the last week in 1999. That's when I made the deal with him for the prepay.

Q: Was it something you asked him about, or did he just sort of gratuitously tell you that?

A: He told me about the trust because I was asking [about the] disability

of the company, and he said this is what it would be going to.

Q: Did you ask him to put that in writing?

A: No, I didn't.

Q: Now, I think that a moment ago, you said that you were concerned about Eades' insolvency at the time that you were making a prepayment to Eades; is that correct?

A: Yes.

Q: Other than the conversation that you had with Mr. Creswick, did you take any other steps to secure your prepayments that you made?

A: No.

Q: So I take it you never obtained a letter of credit?

A: No.

Q: And you never filed any financing statements or obtained any security agreements from Eades -

A: No.

Q: in connection with your prepayments?

A: No.

*Id.* at 18–19.

Mr. Marchy testified he was told by Mr. Creswick in late 1999 that prepayments for his dairy would be held "in trust." No specifics were provided. No writing was completed. No separate account was established. The Marchy Dairy deducted the full amount of prepayments for tax benefits. No other step was taken to secure prepayments. Interest was paid on prepayments.

8. *B & J Dairy*

Plaintiff B & J Dairy first did business with Eades in 1999. Robert Pellandini Dep. at 12. Mr. Robert Pellandini was primarily responsible for the company's business dealings with Eades. *Id.* at 8. B & J Dairy prepaid Eades in 1999 to lock in a price and supply, to deduct the prepay-

ments on its income tax returns and to receive interest on the prepayments. *Id.* at 19–20. Mr. Pellandini testified it was a common practice for the cattle feed industry to offer its customers interest on prepayments. *Id.* at 20. Mr. Pellandini stated B & J Dairy chose not to obtain a letter of credit in his business dealings with others because "if they're a solid business, there's no reason to get it." *Id.* at 25. Mr. Pellandini testified regarding his communications with Eades and Mr. Creswick:

Q: Did you ever talk with Mr. Eades or anybody else from Eades Commodities?

A: No.

Q: Did you do business with Eades through another person or entity?

A: Yes.

Q: Who was that person?

A: Feed Service.

Q: And who would you deal with at Feed Services?

A: Wes.

Q: And did you ever discuss the subject of prepayments with Mr. Creswick?

A: Yes.

Q: And what would he tell you about prepayments?

A: I don't remember what he told me other than he just said you can prepay if you want to. I don't remember exactly anything else.

Q: Okay. Did Mr. Creswick, Mr. Eades or anybody else ever tell you that the money that you prepaid to Eades would be held in trust? Did they ever use that language?

A: That's what Wes told me. It's not used until you take the feed.

Q: Did he use the term "trust?"

A: I'm not—I can't definitely say because I don't remember exact words anymore but . . .

. . .

MR. RICHTER: So Mr. Creswick told you it was not to be used until you take the feed. So—that you'd have a balance with Eades until that feed was delivered? Is that how you understood it?

A: That's right.

Q: Just like a receivable balance?

A: Oh, I don't know what it's like, but it wasn't their money until they brought the feed.

Q: Did Mr. Creswick, Mr. Eades or anybody else ever tell you what they'd do with your money once it was received?

A: I don't remember if he did.

Q: Did he ever promise you that it wouldn't be used to pay any other business expenses?

A: I don't know. I don't think so. I don't know if he said that.

Q: Did he ever tell you that the moneys would be segregated and held in a separate account with A.G. Edwards or any other financial institution?

A: He might have told me that. He said it wasn't their money until the feed was delivered.

Q: But you don't recall him specifically telling you that it would be held separately at another financial institution, do you?

A: I think he did, but truthfully I can't say for sure.

*Id.* at 28–30. Mr. Pellandini testified he did not know Eades had deposited some of the prepayments to A.G. Edwards:

Q: Were you aware prior to today that Eades had deposited prepaid moneys which you had forwarded to it in an account with A.G. Edwards?

A: No.

Q: And I take it, then, you also were not aware that Eades had withdrawn such funds from A.G. Edwards?

A: No.

Q: Did you or anybody from B & J ever communicate with anybody from Diversified Business Credit?

A: I don't know. I never.

*Id.* at 31. Sandra Pellandini, who is the bookkeeper at B & J Dairy testified regarding her understanding of the prepayment deposits:

Q: Okay. What did you mean when you used the term "deposit"?

A: I never even thought about it. By giving it to the prepay, deposit it in the prepay account because all money should be kept separate.

Q: Now, you said all the money should be kept separate. Is that something that somebody else told you, or is that something that you just thought they would do with the money?

A: No one else told me that, no.

Q: So I—so no one from Eades Commodities or Wes Creswick—nobody ever told you that Eades would hold your money in trust; is that correct?

A: I don't remember.

Q: You don't recall them ever saying that?

A: I don't remember that.

Q: Okay. And you don't remember Mr. Eades or Mr. Creswick or anyone else ever telling you what they would do with your money once it was received; is that correct?

A: I don't remember going into that conversation, no.

. . .

Q: And did anyone promise you that that money wouldn't be used to pay other business expenses of Eades?

A: I never talked to Eades, no.

Q: And Mr. Creswick, he never said that, either, did he?

A: No.

Q: Okay. And did anybody ever tell you that the $30,000 would be segregated or held in a separate account? Did anybody ever tell you that?

A: No.

Q: Okay. Did anybody ever discuss A.G. Edwards account or tell you that your money would be deposited with A.G. Edwards?

A: No.

Q: And have you ever seen any documents from A.G. Edwards?

A: No.

*Id.* at 19–21.

No express trust agreement was formed. The Pellandinis understood that prepayments would be kept in a separate deposit account until earned. No security was arranged nor step taken to earmark "deposits" to provide notice to third parties. B & J Dairy took advantage of tax deductions for prepayments. Interest was paid on prepayments.

### 9. *Western Sky Dairy*

Plaintiff George Plantenga dba Western Sky Dairy did business with Eades Commodities since 1989. George Plantenga Dep. at 13. Western Sky Dairy prepaid Eades for cattle feed starting in 1989, except for 1997. *Id.* Western Sky Dairy made prepayments to obtain the benefits of deducting the prepayments on its income tax returns and to receive a fixed price per ton. *Id.* at 23–24. Mr. Plantenga, who was principally responsible for dealing with Eades Commodities, stated he never asked for a security agreement or filed a financing statement to preserve his interest in the prepayments. *Id.* at 11, 42. Mr. Plantenga testified regarding his communications with Eades representatives:

Q: Did you ever—in your dealings with Eades or any other feed merchants, did you ever ask for a security agreement or file a financing statement to protect or to preserve, I should say, your interests in the prepayments?

A: No, I have not.

. . .

Q: Do you ever talk to anybody from Eades Commodities?

A: The representative from Eades Commodities, yes.

Q: Okay. Who was that representative?

A: Eric.

Q: Eric. Do you know what his last name was?

A: I don't know his last name.

Q: Is he the only person at Eades whom you ever spoke with?

A: No. When Eades started out in '89, it was an individual with the name of Mark Pate.

Q: P–A–T–E?

A: Yeah, P–A–T–E.

Q: So early on you'd communicate with a fellow named Mark Pate? Is that -

A: Yes. Yes.

Q: Okay. Other than Mark Pate and Eric, have you communicated with anybody else at Eades?

A: Twice with Bob himself who came over to the dairy, visited us, thanked us for the business, hope we can keep up the good relationship. Kind of a PR thing.

Q: Sure.

A: So that was twice that I actually met Bob Eades himself.

Q: Okay. Let's start with Mark Pate since he was the first person that you communicated with from Eades, correct?

A: Yeah.

Q: Okay. Do you recall the substance of your communications with him?

A: No, but he was the one who actually introduced us to Bob Eades and his firm. I had an excellent deal on corn hominy at the time, and actually, that was our first dealing with Bob Eades through Mark Pate.

Q: Okay. And when did—now, the next person you communicated with was Eric.

A: That's correct.

Q: Okay. When did—at what point did you stop communicating with Mark and begin communicating with Eric?

A: Mark got himself another job.

Q: And when was that?

A: You know, I don't know.

Q: The early -

A: I really don't know how long Mark was with them, but it was two years, three years or one year. After that I communicated over the phone. Before that Mark would call on us. Mark lived in the same area where we do, and he made personal calls. After that we just dealt over the phone.

Q: So would it be—I understand you can't recall the correct year, but would it be fair to say that Mark left in early of—the early 1990s at some point?

A: I would say that—yeah, that's correct.

. . .

Q: Do you recall any of your communications with him?

A: Oh, yes.

Q: Okay. What would you guys talk about?

A: Price.

. . .

Q: Okay. Now, these two conversations that you had with Bob Eades himself, when was the first time you talked with Bob?

A: I cannot recall the first time. I know he was there. And what was said, I don't know. The second time he came over and introduced himself. Bob was also a coin collector, and he left us a little—I think it was a new edition of a silver dollar so—I still have the silver dollar.

. . .

Q: Did any of these three people or anyone else ever tell you that the money that you prepaid to Eades would be held in trust?

A: No.

Q: Is that something—would it be fair to say that that's something that you just assumed?

A: Yes.

Q: Okay. Did anyone ever promise you that the money that you prepaid to Eades would not be used to pay Eades' business expenses?

A: No.

Q: Or that it wouldn't be pledged as security for a loan?

A: No.

Q: And, again, that's something you just assumed, correct?

A: Yes.

Q: Okay. Did anyone ever tell you what Eades did with your money once it was received?

A: No.

Q: Did they ever discuss an A.G. Edwards account or tell you that your money would be deposited with A.G. Edwards?

A: No.

*Id.* at 44–48.

There was no discussion of a trust or segregated account. Full tax deductions were taken for prepayments.

### 10. *George TeVelde Dairy*

Plaintiff George TeVelde individually and dba George TeVelde Dairy made prepayments to Eades in 1998–1999. George TeVelde Dep. at 14. George TeVelde Dairy made prepayments to deduct those prepayments on the income tax returns, to receive interest and to obtain a fixed price for the feed. *Id.* at 23, 27, 29. Mr. George TeVelde was responsible for dealing with Eades. Mr. TeVelde testified there was no side agreement to the contract of sale:

Q: Okay. So as I understand it, then, the contract between you and Eades covered everything? There wasn't any sort of side agreement, it was just that you had prepaid for more than you contracted for. Is that a fair—

A: That's correct.

Q: —summary of your testimony?

A: Uh-huh.

*Id.* at 31. Mr. TeVelde also testified regarding his communications with Eades:

Q: I'd like to talk a little bit about your—about your conversations with people from Eades Commodities. Who was the person that you would principally talk to in doing business with Eades?

A: Wes Creswick.

Q: Did you ever talk directly to anyone from Eades, either Bob Eades, Bob March, anybody else?

A: I did talk to Bob Eades -

Q: Okay.

A: —on two occasions.

Q: Okay. When did you—when was the first time you talked to Mr. Eades?

A: He came out and did a courtesy call. I believe it was '97 or '98, and I met him.

Q: Uh-huh.

A: The second time was after they stopped delivering on the 2000 contracts in March or late February, I should say. I had a short telephone conversation. It was a conference call between Mr. Creswick, Mr. Eades and myself.

Q: Okay. Let's talk first about the '97 or '98 conversation. Okay. Could you just summarize that—what was—what was said.

A: It was just an opportunity to meet him, and he wanted to see—meet his customers and see the businesses he was dealing with. We just exchanged pleasantries. We did not make any dealings at that point.

Q: And this conversation after he had stopped delivery, do you remember the date of that conversation?

A: I—it was late February, I'm pretty sure.

Q: Okay. Perhaps we're just splitting hairs here a bit, but I remember from the spreadsheet that we looked at, Exhibit 3 to your—to your deposition, which is Bates stamped Weststeyn Dairy 4, I think, the last delivery of feed from Eades was on March 8th. Could that conversation have been after March 8th?

A: It may have been.

Q: And that was with you and Mr. Creswick and Mr. Eades on a conference call, correct?

A: That's correct.

Q: Okay. You said it was a short conversation. How long did it last?

A: Probably two minutes.

. . .

Q: Sure. Did Mr. Creswick ever tell you that the money that you prepaid to Eades for feed would be held in trust?

A: No. I don't recall he ever said that.

Q: Is that something that you just assumed?

A: It's conventional. So yes, I—it's conventional in my industry for that to be the case, so I assumed it was the same with Eades, yes.

. . .

Q: And how do you come to the conclusion that it's conventional in your industry for those prepayments to be—for prepayments for feed to be held in trust?

A: I wouldn't say that it's put in trust formally. What I would say is that the money is under my direct control. It can be withdrawn at any time. I've done that in the past. I can either order or not order feed that would be charged against my—my balance, my prepaid balance.

Q: Okay. When you say that you could withdraw at any time, do you mean withdraw money or withdraw feed?

A: The money.

Q: Okay. And you've done that in the past—

A: Yes.

Q: —with Eades.

A: No.

Q: Who did you do that with in the past?

A: It was Davis Commodities.

Q: And when did that happen?

A: In August of 1999.

Q: And what were the circumstances that brought that about?

A: The interest rate that I was paying the bank was higher than what I was getting paid from Davis, and so I paid off my loan at the bank.

Q: Okay. So going back to my earlier question, just to be clear, nobody then—Wes Creswick, Eades or anybody else ever told you that your money would be held in trust. Is that a fair statement?

A: Yes.

Q: Okay. And did anyone ever tell you that the money wouldn't be used to pay other business expenses of Eades?

A: No one ever told me what they would do with it, no.

Q: Okay. And the interest that you received on the prepayments that you made, it was a fixed rate, seven percent, so that if I understand this correctly, if Eades was able to go out and find somebody to give them nine percent, he'd be able to get the two percent difference and pocket it, correct?

A: What Eades -

MR. WALKER: Calls for speculation.

MR. RICHTER: Was the fixed rate of seven pegged to a market rate, or was it a true fixed rate?

A: It was a true fixed rate.

Q: Did anyone ever tell you that the moneys that you prepaid to Eades would be held in a separate account?

A: No.

Q: Did they ever discuss with you an A.G. Edwards account or tell you

that your money would be deposited with A.G. Edwards?

A: No.

Q: And as far as you know, was any of your—the money that you prepaid placed in a separate account with A.G. Edwards or any other financial institution?

A: No.

Q: Other than your contention that you could withdraw the money at any time or order feed at any time, was there any other—anything else that would support your contention that you exercised control over those funds?

A: Nothing that I ever did, no.

. . .

Q: Did you view the prepayments that you made to Eades similar to money that you would deposit with the bank?

A: No.

Q: And why did you not view it the same way?

A: Because it was an expense that was taken in 1999, and the money I deposit in the bank is not an expense.

Q: In your understanding is your ability to obtain and withdraw the funds that you prepaid to Eades the same as your ability to obtain and withdraw funds that you deposit to the bank?

A: Yes.

*Id.* at 41–42, 46–49, 52–53. George TeVelde Dairy did not obtain a letter of credit to protect against the risk. *Id.* at 53. There was no express trust agreement, no segregated or earmarked account, nor were any steps taken to secure prepayments. Full tax deductions were taken for prepayments. Interest was paid on prepayments.

### 11. *Van Steyn Dairy*

Plaintiff Case Van Steyn individually and dba Van Steyn Dairy made prepayments to Eades for seven or eight years. Case Van Steyn Dep. at 17. The contract of sales between Van Steyn Dairy and Eades represented the complete agreement between the parties. *Id.* at 15. Van Steyn Dairy prepaid to take advantage of expense deductions on its income tax returns and to obtain a fixed price per ton, and guaranteed shipment of feed. *Id.* at 27–29. Van Steyn Dairy did not obtain a letter of credit after the first year with Eades although a letter of credit was discussed in 1999 with Mr. Stan Lawrence. *Id.* at 35, 39. Mr. Case Van Steyn, who was principally responsible for the company's business dealings with Eades, testified about his conversations with Mr. Stan Lawrence and Mr. Eades:

Q: Now, I'd like to go back to an earlier comment you made. You said that in addition to the logistical and timing problems with the letter of credit, another reason that you did not obtain a letter of credit for the prepayments that you made at the close of '99 was certain assurances that were made to you by Mr. Lawrence and Mr. Eades.

Why don't we start out by talking about the conversations that you had with Mr. Lawrence. What specifically did he tell you that led you not to obtain a letter of credit to protect against nonperformance in connection with the 1999 prepayments that you made to Eades?

A: I cannot recall verbatim those conversations, but in general the conversation was that there is—the risk is very low, Eades is doing great, and I would not be worried about it.

Q: And when did Mr. Lawrence tell you this?

A:  I can't tell you the date.  Late December or early January.  But probably late December.

Q:  Now, was that the only conversation that you had with Mr. Lawrence in this regard, or did he make assurances to you on other occasions as well?

A:  I don't recall.  But if it came up, Mr. Lawrence assured me that Eades was doing fine and that we had a longstanding relationship.

Q:  All right.  How about the comments made to you by Mr. Eades?

A:  Bob Eades took us to lunch—several of his customers to lunch.  I don't recall all the names of who was there.

. . .

Q:  Okay. And did Mr. Eades tell everybody at that lunch gathering?

A:  I don't recall in detail.  Just that—I think he passed out the prepaid letter, passed out a gift of—some kind of a coin in a gift box, and told everybody that—thank you for your business, and we'll have a great relationship next year.  And if you need to prepay see me, or if you want to.  It was all presented as very positive.  I do not recall a one-on-one discussion, you know, of my asking Mr. Eades how's your company doing.  I don't think I did that.

Q:  Now, did you have any other conversations with Mr. Eades?

A:  Not that I recall.

Q:  Okay.

A:  Wait. Excuse me.  In January—no, not January.  Sometime in March Mr. Eades called me after this—is that what you're asking about?

Q:  How about in late 1999?  Say in the last quarter of 1999?

A:  No, I did not talk to Mr. Eades.

. . .

Q:  Did Mr. Eades, Mr. Lawrence or anybody else ever tell you that they would hold your prepay money in trust?

A:  Yes, or it was implied that that was my money, it would be kept in a separate account or track of on statements, and that it was—and that it would be—it was clearly my money.

Q:  Okay.

A:  Until invoices were written and then they were—the agreement was that as invoices were written, as products would be delivered, they would be deducted from that amount of money.

Q:  Okay. When did Mr. Eades or Mr. Lawrence or whomever tell you that? When did they tell you this?

A:  It's been an ongoing consideration. That's the way it was done.  I don't remember if it was in '93, '4, '5 or '6, but those are the types of discussions, that it was always going to be my money.  And that they would hold it and that they could use it for—you know, I mean we didn't have a detailed contract, but that it was clearly my money, it would be kept separate from everybody else's money.  I don't know if that meant in a separate bank account or if it meant in an account with my name on it.  I don't—I can't tell you that.

Q:  Did anyone ever tell you from Eades or anywhere else what Eades did with your money after it was received, where it went?

A:  Not specifically.

Q:  Did they ever specifically tell you that they would hold your money in— or put your money in a segregated account with A.G. Edwards or any other financial institution?

A:  No.

Q: Did they ever specifically tell you that they would hold your money in trust?

A: I don't know what the exact definition of in trust—I don't know exactly what that means.

Q: Forget the legal definition. Did they ever use that word with you, specifically say, Mr. Van Steyn, we're going to place your money in trust, those words specifically?

A: It's—my recollection says yes, but I can't swear to it.

Q: Did they ever specifically tell you that they would not use the money—did anyone ever specifically tell you that Eades would not use the money that you prepaid to pay other expenses of Eades Commodities?

A: No. Could you repeat the question? I'm not sure I answered right.

A: No.

Q: Did you ever—did you ever speak with anybody from A.G. Edwards?

A: No.

. . .

Q: Are you aware that prepay moneys that you sent to Eades were deposited with A.G. Edwards?

A: No.

Q: And you're unaware of whether any of those funds were ever withdrawn from A.G. Edwards?

A: I'm unaware. Yes, I'm unaware.

. . .

Q: Okay. Going back to your earlier testimony and, again, I'm paraphrasing, but you said that you had the impression that your funds would be held separate, your prepay funds, and that you got that impression early on in your business dealings with Eades; is that correct?

A: Yes.

Q: Is that a fair summary of your testimony?

A: Yes.

Q: Okay. Did Mr. Eades or Mr.—or Stan Lawrence or anyone else make statements to you that renewed that understanding in 1999?

A: Excuse me?

Q: You said earlier on—early on in your business dealings with Eades, which we're talking early to mid 1990s, as I understand it, you received the impression . . . .

A: I think that is ongoing. The impression has never changed.

Q: Right. And my question to you is, has your impression not changed because Eades never told you anything different or because Eades would keep saying things to that effect and specifically in 1999? I mean your decision—your understanding of how—let me just rephrase it.
Your understanding of how your prepayments would be dealt with in '99, was that based on the earlier understanding that you had with Eades in 1993 and 1994 and 1995, that time frame, or was that based on statements that Mr. Eades or Stan Lawrence or anybody else made to you later on, say, in 1999?

A: Well, the answer would be both.

Q: Okay. So what statements did Mr. Eades or Stan Lawrence make to you in 1999 that led you to believe that your 1999 prepayments would be held separate? Do you recall any specific—

A: I can't recall specific comments or quotes, but in the discussion of this activity, including the itemized statements that would have my name on them and show the balance in that account at all times, it was clear to me that it was my money in my account, in some kind of a trust account, but I don't—I can't say the word "trust"

was used for positive. It seems to me it was used, but I can't swear to that. And I will be clear, I can't recall the exact discussions, but those were the—the ideas that were discussed, and that it was, you know—because of course security is discussed or potential problems are considered, and in those discussions that's the reassurances that I got.

*Id.* at 43–44, 46–52.

There was no express trust agreement. Full tax deductions were taken for prepayments. No steps were taken to secure prepayments or otherwise segregate or earmark the prepayments.

### 12. *Van Warmerdam Dairy*

Plaintiff Van Warmerdam Dairy did business with Eades for three to four years. Leo Van Warmerdam at 17. Van Warmerdam Dairy prepaid to obtain a tax deduction on its income tax return and to obtain a fixed price per ton and an assured quantity of feed. *Id.* at 27. Van Warmerdam Dairy never discussed obtaining a letter of credit in connection with its business dealings with Eades. *Id.* at 36. Mr. Leo Warmerdam, who took part in running the dairy, testified about the dairy's relationship with Eades:

Q: Did you order feed directly from Eades, or did you order it through a third party broker?

A: Broker Wes Creswick.

Q: Have you or has anyone at Van Warmerdam Dairy ever spoken directly with Mr. Eades or with anybody else at Eades Commodities?

A: My father spoke with him. I'm not sure if he—because I recall asking him today and—he don't recall exactly who he talked to at Eades Commodities.

Q: Okay.

. . .

Q: And did you or anybody else from Van Warmerdam Dairy ever discuss the subject of prepays with Mr. Creswick?

A: Once in a while Craig would—I mean Wes would—he would let you know what the various feed companies were offering—what some of the other feed companies were offering, just a general practice that he does as a broker. He'll, you know, let you know who's doing what.

. . .

Q: Did Bob Eades or Mr. Creswick or anybody else ever tell you that your prepay moneys would be held in trust? Did he ever use that language?

A: No.

. . .

Q: Did Mr. Eades, Mr. Creswick or anybody else tell you what they would do with your money once it was received?

A: . . . It would just—it would go on as a credit. It would go in as a credit to Eades Commodities. Credit on account.

Q: And did they ever promise you that the money that you prepaid wouldn't be used to pay other business expenses of Eades?

A: No.

Q: Did they ever tell you that the moneys would be segregated or held in a separate account with A.G. Edwards or any other financial institution?

A: No.

*Id.* at 40–43.

No trust agreement existed. No security was taken nor other steps to earmark or

segregate prepayments were accomplished. Full tax deductions were taken.

### 13. *Weststeyn Dairy*

Plaintiff Weststeyn Dairy made prepayments to Eades from 1996–99. Bert Weststeyn Dep. at 22. Weststeyns' checks made out to Eades Commodities were sent to a Minneapolis post office box address. *Id.* at 24. Plaintiff Weststeyn Dairy prepaid for feed at the end of the year to deduct the prepayments on the income tax returns, to guarantee supply of product at a guaranteed price and to receive interest on the prepayments. *Id.* at 31–34. Mr. Bert Weststeyn testified as to his discussions with Mr. Stan Lawrence and Eades representatives:

Q: I take it you had conversations with people from Eades Commodities at some point in time?

A: Sometimes.

Q: Okay. And what would you take—or who would you talk with?

A: Mostly the broker who represented Eades, Stan Lawrence.

Q: And what would you and Mr. Lawrence talk about?

A: He's got grain he wants to sell, we may want to buy it.

Q: Okay. Would you talk to anyone else in addition to Mr. Lawrence?

A: Very rarely.

Q: Well, sometimes those rare conversations matter so—

A: I talked to Bob March once or twice.

Q: And one of those conversations was the conversation that—concerning the five to three-quarter percent interest you were getting?

A: Correct.

Q: Okay.

A: Not the letter of credit.

Q: Yeah. How about Bob Eades? Have you ever talked to him?

A: Yeah, once or twice he'd come out. Maybe once a year in the fall.

Q: Okay. Just a sales and marketing visit, exchange pleasantries and the like, or was there more to it than that?

A: No, not really marketing.

. . . .

Q: Okay. That was the gist of your conversations with Mr. Eades the one or two times that you spoke with him?

A: Well, I asked him about his company.

Q: Yeah. What would you ask him?

A: How they're doing.

Q: Uh-huh. And what would he say?

A: They were doing good.

Q: Yeah. Did he say anything else?

A: Nope, but I talked to Bob March.

Q: Okay. What?

A: Asked him.

Q: How the company was doing?

A: Yeah.

Q: And what would he say?

A: It's doing good. That way a letter of credit is 80 percent, not 90 percent.

Q: Did Mr. March or Mr. Eades tell you anything else that you can remember other than pleasantries and our company is doing good?

A: Your money is in good hands.

Q: How about Mr. Lawrence? What would he say?

A: I only talked to Mr. Lawrence about price and feed that I want to buy or that he wants to sell.

Q: You just talked to him about doing deals basically?

A: Yeah.

Q: How about anybody else? Anybody else from Eades you talked to?

A: Don't know anybody else from Eades.

. . .

Q: Looking at those contracts, are these contracts the complete agreement between you and Eades, or is there some other side agreements that I should know about?

. . .

Q: And in just repeating my question, are those contracts the complete agreements between you and Eades? Are there other terms that were not in the contracts that you considered material in your business dealings with Eades?

. . .

A: These were written up at the time of the sale.

Q: Uh-huh.

A: 10/1/99, 10/11/99, 9/15/98.

. . .

Q: With respect to that product that was to be shipped in 2000, did you have any other agreement with Eades with respect to that product which was to be delivered other than what is contained here in the contract of sale confirmation and whatever might appear on the back side of the page because I noticed in the box it says, notice, read the provision on the contract on the reverse side.

I don't have that. But other than what appears on this and what would have appeared on the reverse side if I had it here to show you, is there anything else that's not included?

A: This was written up before there was any prepay. When you buy commodity during the year, they would write up the contracts on single contracts. That was the tons. That was the price and delivery.

. . .

Q: Okay. Let's do this a little different. Did anyone, Stan Lawrence, Bob March, Bob Eades, anybody else, did they ever tell you that they'd hold your money in trust—excuse me, that Eades Commodities would hold your money in trust?

A: They didn't say necessary it was in a trust. It was set apart over here. It was your money.

Q: Did anyone tell you that your moneys would be segregated or held in a separate account?

A: Supposed to be held in a separate account.

Q: Did anybody tell you that, or did you just assume it?

A: Well, I don't recall that. I was led to believe per they set it—it wasn't commingled with everything else. It was set apart.

Q: Who led you to believe that?

A: From March and Bob.

Q: Okay. What did they tell you that led you to believe it?

A: The money went to the lock box or whatever they talked about. The money went to the lock box. You got your product. The reduced the amount that you were prepaying by that much.

Q: No. You assumed that he wasn't going to pay other people with that money.

A: Right.

Q: And you assumed that he'd hold your money in trust?

A: Assumed, yes.

Q: Did March or Eades or anybody else ever tell you what they did with

Q: their money once it was received? Did they tell you where they put it, what the spent it on?

A: No, they didn't say.

Q: Okay. Did you get any statements or anything like that from—showing what they did with it?

A: No. They'd tell you what your pre-pay account—what was left in your prepay account.

. . .

Q: You said earlier that Mr. Eades and Mr. March, I believe, led you to believe that your moneys would be held in a lock box. Other than that, did they tell you anything else that would lead you to believe that your money was held in trust by them from you?

A: Well, that's what they said. It was supposed to be a lock box, trust, you know, separate.

Q: But they never told you where they hold it separately, did they? They didn't tell you, for example, that your money would be held at A.G. Edwards or at any other financial institution, did they?

A: No, they didn't say that.

Q: Okay. As far as you know, was your money ever placed in a separate account with A.G. Edwards or any other financial institution?

A: Not that I know of.

. . .

Q: Do you recognize this document?

A: Yeah. It was sent from Stan.

Q: And looking at the top of the document, the fax line indicates that it was sent March 1st of 2000. Do you see that?

A: Yes.

Q: And the first paragraph of the document goes through and talks about how Eades is insolvent and cannot

ship product. And then the last sentence of that first paragraph says the prepays represent trust accounts that are not receivables until the product is shipped to and arrives on the dairyman's property. Is that the first time that Mr. Lawrence had told you that the funds were represented as trust accounts? Prepay moneys?

A: The first time that Stan said it was a trust account?

Q: Uh-huh.

A: I don't recall that, but -

Q: You don't recall him ever saying it was a trust account, or you don't recall him saying it was a trust account before that?

A: Well, I don't recall that. This was the first time he said that.

Q: Do you recall any times prior to the 1st of March when he represented to you that the prepays represented trust accounts? I believe your testimony was earlier that he was Eades broker and you just talked about doing deals with him.

A: Yeah. We just did deals with Stan.

Q: So you didn't talk about whether the prepay moneys were trust accounts with him? Not—at least not until you received this?

MR. WALKER: Well, it misstates his testimony considerably.

MR. RICHTER:

Q: Is that right?

A: No, not—when—you prepay once a year. You know, you buy feed every day or a couple times a week so
. . .

Q: Okay. Let me—let me ask if a different way. Do you recall any time prior to March 1st that you ever spoke with Stan Lawrence and he

told you that the money that you prepaid to Eades was held in trust?

A: He didn't. If it wasn't said, it was led to believe it was when I talked to March, Bob Eades.

Q: And I understand your testimony is that they led you to believe that. But prior to March 1st of 2000 did Stan Lawrence ever lead you to believe that?

A: No, I don't think I talked to Stan Lawrence much about prepay.

*Id.* at 59–63, 65–67, 71–73.

No express trust agreement was made. No security was taken, nor were there any segregated or earmarked accounts for prepays. Full tax deductions were taken for prepayments. Interest was paid on prepayments.

14. *J & M Bettencourt & Sons Dairy:*

Joe Bettencourt testified that prepayments were discussed with broker, Mr. Creswick. Mr. Bettencourt recognized one of the motives to prepay was to take a tax deduction for the prepayment. A guarantee of delivery of the product and a fixed price per ton were also advantages. J & M Bettencourt Dairy was also paid interest on the prepayments. Joe Bettencourt testified:

Q: Did you ever discuss prepayments with Mr. Creswick?

A: Yes.

Q: Okay. And what would he tell you about prepayments?

A: What companies had to offer in terms of prepayment.

Q: The incentives that they provide?

A: (Witness nods head.)

Q: Did Mr. Eades or Mr. Creswick or anybody else ever tell you about the money that you prepaid would be held in trust? Did he ever use that language?

A: No.

Q: Did they ever tell you what they'd do with your money once it was received?

A: No.

Q: Did they ever promise that it wouldn't be used to pay other business expenses?

A: No.

Q: Did they say that the monies would be segregated or held in a separate account?

A: No.

Q: Did they discuss an A.G. Edwards account or tell you that your money would be deposited with A.G. Edwards?

A: I never heard the name, no.

Q: So you never talked with anyone from A.G. Edwards; is that correct?

A: No. That means yes. Am I saying that correct?

Q: Let me rephrase the question. Is it true that you never talked to anyone from A.G. Edwards?

A: Yes.

Dep. 34:9–35:14.

No trust was made. No segregation or earmarked accounts were established for prepayments. Tax deductions for prepayments were taken. Interest was paid on prepayments.

At the end of 1999, Plaintiffs' aggregate feed prepayments to Eades were approximately $1.85 million. In two instances, one of the plaintiffs and another customer requested and received a refund of prepay monies that had been deposited earlier with Eades. TeVelde Dep. at 46:18–47:15; Eades Dep. at 114:17–115:25.

Since 1989, Eades deposited the prepayments it received from its customers into a lockbox at National Citibank in Minneapolis. Eades Depo. at 17:6–18:20. Cash

proceeds in the lockbox were used to pay down Eades' line of credit to facilitate additional advances under the line of credit. Eades Dep. at 17:11–18:3. Eades had no verbal or written agreement with any customer that restricted Eades' ability to use all prepayment funds to pay Eades' lender. Eades Dep. at 19:2–5. The parties dispute whether Eades included prepayments in the daily accounts receivable reports provided to Diversified. In no instance was there any written agreement to evidence the "trust" Plaintiffs argue for, nor was there any written modification of any prepaid feed contract.

In 1999, Eades began to experience financial difficulties. Throughout 1999 and into 2000, Eades sought other investors or a new lender. Eades Dep. at 41, 74–75. In Fall 1999, Diversified discovered Eades had materially misreported its accounts receivable balance to Diversified, requiring Diversified to reduce by $3.7 million the collateral base that Diversified was able to lend on under its loan formula. Tomaszek Decl. at ¶ 12. The physical count of feed inventory for the fiscal year ending July 31, 1999, revealed that Eades had to write down its inventory nearly $1 million in addition to another, early 1999, nearly half million dollar downward inventory adjustment made by Eades. The audit and inventory adjustments resulted in a preliminary operating loss to Eades through July 31, 1999, of almost $2 million.

In January 2000, Diversified refused to extend Eades new letters of credit on behalf of Eades' customers and imposed new borrowing restrictions on Eades. *Id.* When Eades was informed by Diversified that Diversified would no longer issue letters of credit for Eades' customers, Eades deposited $525,195.60 in prepayments it had received from six of the Plaintiffs into money market accounts at A.G. Edwards & Sons, Inc. in Omaha, Nebraska. Id. Eades established the A.G. Edwards &

Sons accounts for prepaying customers who might want letters of credit. The accounts were in Eades' own name. Eades did not notify the customers of the deposits into the A.G. Edwards accounts. Eades designated each account as "for the benefit of" ("fbo") a specific customer to keep track of the individual prepay balances of each customer. Eades Dep. at 56–58.

On January 21, 2000, Diversified learned that Eades had deposited some of the prepayment money with A.G. Edwards. Tomaszek Decl. at ¶ 13. Diversified declined to renegotiate the terms of the existing credit restrictions and refused to extend additional funds until Eades paid down its loan balance. *Id.* at ¶ 14; Eades Dep. at 59–60. Subsequently, Eades forwarded the A.G. Edwards deposit funds to Diversified and Diversified advanced additional money to Eades under Eades' line of credit. Eades Dep. at 60–69, 158–59; Tomaszek Decl. at ¶ 15. Eades' customers, including Plaintiffs, received shipments of feed through March 2000. TeVelde Dep. at 20–22; Jongsma Dep. at 25–27; Borroughs Dep. at 25–29; Lawrence Dep. at 26–28; Van Steyn Dep. at 23–24; Warmerdam Dep. at 24–26; Marchy Dep. at 11–12; Joe Bettencourt Dep. at 17–19; Garcia Dep. at 16–19; Sandra Pellandini Dep. at 11–13; Alamo Dep. at 12–13; Herzog Dep. at 15–17; Weststeyn Dep. at 24–28. After Eades' unaudited financial statements revealed additional net income loss and Eades was unable to comply with new borrowing restrictions, Diversified stopped making additional advances to Eades on February 14, 2000. Tomaszek Decl. at ¶ 16.

Plaintiffs' prepaid account balances with Eades, after reduction for grain delivered in 2000 are as follows:

| | |
|---|---|
| Alamo Dairy | $ 12,697 |

| | |
|---|---|
| J & M Bettencourt Dairy | $ 30,959 |
| B & J Dairy | $ 18,430 |
| Garcia Dairy | $ 18,810 |
| Marchy Dairy | $ 15,597 |
| Sleepy Hollow Dairy | $  9,424 |
| George TeVelde Dairy | $331,132 |
| Van Steyn Dairy | $ 64,594 |
| Larrybell & Sons Dairy | $ 66,131 |
| Western Sky Dairy | $135,607 |
| Weststeyn Dairy | $135,734 |
| Willy Creek Ranch | $ 93,369 |
| Vista Livestock | $113,426 |
| Van Warmerdam Dairy | $ 57,113 |

On February 22, 2000, Eades's president, Bob Eades, sent a letter to David Andreas, President of National City Bank of Minneapolis, regarding the prepayment deposits made to the bank pursuant to the lending arrangement with Diversified. Eases Dep. Ex. 27. Eades' letter states in part:

> Eades Commodities Company customers presently have on deposit with Diversified Business Credit $1,583,886.16. These deposits are for the benefit of 30 dairy farmers in six states. These farmers depend on these funds to feed their animals. The urgency in live animal matter is hours not days or weeks and DBCI personnel will not discuss this with us.
>
> These deposits are not "proceeds of collateral," they are classified as "non-accounts receivables" they are reported to DBCI this way and DBCI requires us to maintain records separate from collateral accounts receivable. DBCI is refusing to release these deposits. Your bank has a fiduciary responsibility to return these funds.

*Id.* On March 1, 2000, Stan Lawrence, a Feed Services Company employee, sent a number of Plaintiffs a letter urging them to contact a lawyer because he thought there was a considerable difference of opinion regarding the prepay money.

Weststeyn Dep. Ex. 10. The Lawrence letter states in relevant part:

> To the best of my knowledge Eades Commodities is insolvent, they cannot ship product on contracts from their suppliers to their customers because the bank [h]as withdrawn the line of credit and seized all prepay accounts. There is a considerable difference in opinion regarding the prepay monies between Eades and the Bank. While the bank has legal right to all monies arising from Accounts Receivable (i.e. Invoices) [,][t]he prepays represent "trust" accounts that are not receivables until the product is shipped to and arrives on the dairyman's property.

*Id.*

### III.  *STANDARD OF REVIEW*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in the light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Prods., Inc.,* 268 F.3d 639, 644 (9th Cir.2001).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux,* 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

Evidence submitted in support of, or in opposition to, a motion for summary judgment must be admissible under the standard articulated in 56(e). Properly authenticated documents can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1550–51 (9th Cir.1989). Supporting and opposing affidavits must be made on personal knowledge, set forth such facts as would be admissible in evidence, and show that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e).

## IV. DISCUSSION

### A. Evidentiary Objections

■ Plaintiffs raise objections to Diversified's failure to properly authenticate deposition transcripts and to lodge original deposition transcripts used in its motion as required by Local Rule 43–140(b), Rule 5–134(e) and Fed.R.Civ.P. 30(f). The issue is resolved by Diversified's filing of properly authenticated original deposition transcripts. Plaintiff Willy Creek also objects to the deposition and exhibits of any Plaintiffs in the Weststeyn action against Diversified and Eades as irrelevant and hearsay because consolidation pursuant to Fed. R.Civ.P. 42(a) does not merge the separate lawsuits into a single action, citing *Johnson v. Manhattan Ry.,* 289 U.S. 479, 497, 53 S.Ct. 721, 77 L.Ed. 1331 (1933) and *Enterprise Bank v. Saettele,* 21 F.3d 233, 235 (9th Cir.1994). While the depositions and exhibits of the Weststeyn Plaintiffs may have little bearing on Willy Creek's case against Defendants, Willy Creek provides no authority requiring Diversified to file separate summary judgment motions in a consolidated case and these objections are OVERRULED.

■ Diversified's hearsay objections relating to Plaintiffs' testimony as to statements made by Mr. Eades, Mr. Stan Lawrence and Mr. Creswick offered to show Eades intended to establish a trust are OVERRULED. Plaintiffs offer statements by Mr. Eades, Mr. Lawrence and Mr. Creswick not as non-hearsay admissions of a party opponent under FRE 801(d)(2)(A) but as evidence to show the relevant parties' state of mind and intention in regards to the formation of a trust. Under Federal Rule 803(3), "[a] statement of the declarant's then existing state of mind ... such as intent ... is not excluded from admission into evidence by the hearsay rule, regardless of the declarant's availability as a witness."

**B.** *Conversion and Unjust Enrichment Claims*

"Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Fischer v. Machado,* 50 Cal.App.4th 1069, 1072, 58 Cal. Rptr.2d 213 (1996) (quoting *Weiss v. Marcus,* 51 Cal.App.3d 590, 599, 124 Cal.Rptr. 297 (1975)). "To establish conversion, plaintiff must establish an actual interference with his *ownership or right of possession* ...." *Id.* (emphasis in original). Plaintiff must prove he owned or had the right to possess the money at the time of the conversion and that defendant willfully and without legal justification interfered with this right. *Otworth v. Southern Pac. Transp. Co.,* 166 Cal.App.3d 452, 458, 212 Cal.Rptr. 743 (1985).

To establish a claim of unjust enrichment, plaintiff must prove (1) receipt of a benefit and (2) unjust retention of the benefit at the expense of another. *Lectrodryer v. Seoulbank,* 77 Cal.App.4th 723, 726, 91 Cal.Rptr.2d 881 (2000). "A person's notice of the circumstances giving rise to unjust enrichment affects that person's obligation to make restitution." *First Nationwide Savings v. Perry,* 11 Cal.App.4th 1657, 1668, 15 Cal.Rptr.2d 173 (1992). Where defendant has received money to which plaintiff is entitled, the law presumes a contract if it is necessary to do so to enable plaintiff to recover the money in an action of debt, *indebitatus assumpsit,* which, though an action at law, is equitable in its nature. *Philpott v. Superior Court,* 1 Cal.2d 512, 523, 36 P.2d 635 (1934).

Diversified contends Plaintiffs cannot meet the requirements for the claims of conversion and unjust enrichment as a matter of law. Diversified claims Plaintiffs undisputedly transferred all right, title and interest on their feed prepayment funds to Eades. Defendant argues the essence of the relationship between each Plaintiff and Eades was solely that of a buyer and seller of goods. Diversified asserts that Eades' payment of interest to Plaintiffs is a tell-tale characteristic of a simple debt and is fundamentally inconsistent with the existence of a trust.

*1. Payment of Money as Trust or Debt*

A voluntary trust is created by acts or words of the trustor which indicate (1) an intention to create a trust and (2) the subject, purpose, and beneficiary of the trust. *Abrams v. Crocker–Citizens Nat. Bank,* 41 Cal.App.3d 55, 59, 114 Cal.Rptr. 913 (1974).[1] A trust is established where the trustee's acts or words express (1) his acceptance of the trust, or his acknowledgment, made upon sufficient consideration, of its existence, and (2) the subject, purpose, and beneficiary of the trust. *Id.* "The use by the parties of the word 'trust' or the words 'in trust' does not necessarily manifest an intent to create a trust relationship." *Petherbridge v. Prudential Sav. & Loan Assn.,* 79 Cal.App.3d 509, 516, 145 Cal.Rptr. 87 (1978) (citing *Abrams,* 41 Cal. App.3d at 60, 114 Cal.Rptr. 913).

"The payment of money may create either a debt or a trust, depending upon the intentions of the parties." *Abrams,* 41 Cal.App.3d at 59, 114 Cal. Rptr. 913. "If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention

---

**1.** *Abrams'* definition of a trust was based on Cal. Civ.Code §§ 2221 and 2222, which were repealed in 1987 because they "served no useful purpose and [were] inconsistent with the classifications usually used by the courts."

Law Revision Commission Comment 1986 Repeal. However, *Abrams* remains good law in California and is cited in *In re Niles,* 106 F.3d 1456, 1463 (9th Cir.1997) and 11 Witkins, Trusts § 3 at 885 (1990).

is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or a third person, a debt is created." *Id.* (citing Restatement (Second) of Trusts § 12, cmt. g). Whether a debt or trust is created by payment of money depends on circumstances surrounding the transaction, including: (1) the presence or absence of an agreement to pay interest; (2) the amount of money paid; (3) the time to elapse before the payee must perform his agreement; (4) the relative financial positions of the parties; (5) the relationship between the parties; (6) the custom in similar transactions. *Id.* According to Comment g of Restatement (Second) of Trusts § 12:

> If there is an understanding between the parties that the person to whom money is paid shall pay "interest" thereon (at a fixed or at the current rate, and not merely such interest as the money, being invested, may return) the relationship is practically always a debt and not a trust.

The view expressed in the Restatement has been generally adopted in California. *Marsh v. Home Fed. Sav. & Loan Assn.,* 66 Cal.App.3d 674, 681, 136 Cal.Rptr. 180 (1977).

In opposition, Plaintiffs argue payment of interest is completely consistent with their ownership of the prepayments. Plaintiffs contend the Eades advertisement for the prepay incentive program establishes that the parties regarded the funds as property of Plaintiffs. The advertisement states in part:

> EARNED PREPAY CREDIT—this is a cash credit at a rate of 7% on your prepay balance at the end of each month. This calculated amount is added back to the prepay balance at the month end, and a statement showing the appli-

cation and balance is sent to prepay customer.

Plaintiffs argue it is a "far-fetched" notion to believe that Eades would charge itself interest on funds that Eades owned.

Weststeyn Plaintiffs also argue that if the Restatement drafters had any intention to completely foreclose the creation of trust upon payment of interest, they would have done so in clear, unqualified language. Weststeyn Plaintiffs acknowledge that while the payment of interest often evidences a debtor-creditor relationship, such payment does not preclude the creation of an express trust. Plaintiffs cite *Marsh,* 66 Cal.App.3d at 683 n. 4, 136 Cal.Rptr. 180, which states, "there is ... some authority to the effect that a trust is created in spite of" an agreement to pay interest.

While Footnote 4 in *Marsh* suggests that there is authority to support the argument that a trust may be created in spite of an agreement to pay interest, the Weststeyn Plaintiffs omit the rest of Footnote 4 which states: "Where the bank undertakes to pay interest on the deposit, it is clearly the intention of the parties that the bank should have the use of the money, and that it becomes a debtor and not a trustee. Interest is paid for the use of money, and the bank would hardly undertake to pay interest unless it were to have the use of the money." *Marsh,* 66 Cal.App.3d at 683 n. 4, 136 Cal.Rptr. 180. Willy Creek's argument that it would be "far-fetched" for Eades to charge itself interest on money it owned is misplaced, because Eades' payment of "interest" or granting a price discount represents an incentive to customers to make prepayments and was used by Eades to increase commodity sales. While Eades' payment of 7% interest on prepayments is not conclusive evidence of a creditor-debtor relationship, under all the cir-

cumstances here, such interest payments are more indicative of a debt than a trust.

Willy Creek presents Mr. John Bettencourt's expert opinion that Willy Creek retains "possession of the prepayment" until grain feed is shipped in satisfaction of the sales agreement. Mr. Bettencourt opines that the cash received by Eades as a feed broker creates a trust relationship between the feed broker and the dairy, in which the feed broker should hold the payment in trust for the dairy until the product is shipped. Mr. Bettencourt avers that a feed broker should carry the entry of the prepaid expense as an item of Deferred or Unearned Income. *Id.* at ¶ 4. "As product is shipped, and only then, the broker should make the appropriate accounting entry to show that the income has been earned." *Id.* at ¶ 5.

The evidence shows Eades did not segregate prepayments in a separate account as an unearned income item and regularly used prepayment funds in conducting its own business. There is dispute regarding whether Eades recorded all prepayments it received as accounts receivable, because one Eades collection report placed the customer prepays in the "adjustments" column (Tomaszek Dep. Ex. 7), and another Eades collection report placed the customer prepays in the "not assigned" column (Tomaszek Dep. Ex. 8). It is undisputed that Eades freely used the prepayments to pay down its loan balance with Diversified. Tomaszek Decl. at ¶ 7; Eades Dep. at 16, 18. It is also undisputed that the written sales agreement between Eades and each Plaintiff did not restrict Eades' ability to use the prepayment funds for its own benefit, nor from commingling the prepayments with Eades' other funds it received and used in the ordinary course of business.

■ Weststeyn Plaintiffs contend that under Marsh, Eades and Plaintiffs' con-

duct manifested an intent by the parties to establish an express trust:

> An express trust may arise even though the parties in their own minds did not intend to create a trust. As in the case of the making of a contract, so in the case of a trust, an objective rather than a subjective test is applied. It is the manifestation of intention which controls and not the actual intention where that differs from the manifestation of intention.

*Marsh*, 66 Cal.App.3d at 682, 136 Cal.Rptr. 180. Plaintiffs collectively contend with varying degrees of certainty that their cases present objective circumstances in which an express trust relationship arose through the conduct and manifest intention of the parties, notwithstanding the payment of interest on each Plaintiff's prepayment balance. As evidence of the manifestation of the intention of the parties, the Weststeyn Plaintiffs refer to deposition testimony of Plaintiffs Case Van Steyn, Bob Marchy and Max Herzog:

> Q: Did Mr. Eades, Mr. Lawrence or anybody else ever tell you that they would hold your prepay money in trust?
>
> A: Yes, or it was implied that that was my money, it would be kept in a separate account .... and that it was—and that it would be—it was clearly my money.
>
> Q: Okay.
>
> A: Until invoices were written and then they were—the agreement was that as invoices were written, as products were delivered, they would be deducted from that amount of money.
>
> Q: Okay. When did Mr. Eades or Mr. Lawrence or whomever tell you that? When did he tell you this?

A: It's been an ongoing consideration. That's the way it was done.

Van Steyn Dep. at 48:7–49:4.

This testimony is ambiguous. The witness in answering a compound question, does not unequivocally state there was an express representation that a trust was to be formed for prepayments, to be held by Eades for the benefit of an identified party. Nor can the witness say what any Eades' representative specifically stated about a "trust."

Weststeyn Plaintiffs also refer to the deposition testimony of Plaintiff Bob Marchy regarding Wes Creswick's representations concerning a trust relationship between Eades and Plaintiff:

Q: Okay. Did Mr. Creswick or anybody else from Feed Services tell you that the prepayments that you made would be held in trust?

A: Yes.

Q: Okay .... who told you that they would be held in trust?

A: Wes.

Q: And did he use the specific word "trust"?

A: Yes.

Q: And when did—when did he first tell you that?

A: When I was first striking the deal with him ...

Robert Marchy Dep. at 17. The question does not ask the witness to describe what words were used in discussing a "trust," rather only that the word "trust" was stated. Plaintiff Max Herzog testified that Eades' Chief Financial Officer, Bob March, in response to whether the word "trust" was used, refers to a 1998 discussion:

Q: And how about the conversation that you had with Mr. March in '98?

A: Definitely.

Q: Okay. And could you tell me in a little bit more detail what was discussed?

A: I called and asked him about the program.

Q: Uh-huh.

A: He explained to me that these funds would be going into a trust that would not be an invoice for expense until the feed was delivered.

Q: And did he use that specific word "trust"?

A: I don't remember the specific word, but it was certainly implied that they were going into a trust.

Herzog Dep. at 20.

Willy Creek contends an express trust arose because Willy Creek gave Eades the prepayment with the explicit understanding that Eades was to use the fund to pay for feed, if and when it was delivered in the future. *See* Jongsma Dep. at ¶ 2. Willy Creek's expert, Mr. John Bettencourt, a California Certified Public Accountant, offers the opinion that "[p]repaid expenses are common in the ag community especially in dairies." Bettencourt Expert Decl. at ¶ 1. Mr. Bettencourt states that a feed broker should carry the entry of the prepaid expense as an item of Deferred or Unearned Income. *Id.* at ¶ 4. "As product is shipped, and only then, the broker should make the appropriate accounting entry to show that the income has been earned." Mr. Bettencourt gives the legal opinion that "the cash received by the feed broker creates a trust relationship between the feed broker and the dairy, in which the feed broker should hold the payment in trust for the dairy until the product is shipped." *Id.* at ¶ 6.

Mr. Bettencourt bases his opinion on his experiences as a trustee, executor, and accommodator, in like-kind exchanges and thirty years experience in public accounting. *Id.* None of this experience qualifies Mr. Bettencourt to give a legal opinion on an issue of law, the existence of a trust.

*See Elsayed Mukhtar v. California State University, Hayward,* 299 F.3d 1053, 1066 n. 10 (9th Cir.2002) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law."). Mr. Bettencourt further states that "prepaid expenses are permitted under the Internal Revenue Code, and the corresponding [tax-expense] deductions taken by the dairymen were appropriate." *Id.* at ¶ 2. This may be true in accounting, but it does not address the issue that the buyer of the feed has paid in advance and deducted the full cost of the feed purchased in the year of prepayment. How the seller accounts for prepaid feed revenue for tax purposes, has some evidentiary weight in evaluating the issue of ownership of the feed that the buyer has purchased and expensed for tax purposes.

Plaintiffs refer to Bob Eades' deposition testimony as evidence of a trust relationship between Eades and Plaintiffs. According to Plaintiffs, Eades' testimony reinforces Plaintiffs' rights of ownership in prepayments because it confirms that Eades earned portions of the prepayments it held for Plaintiffs only when Eades made delivery of feed:

A: We had approximately 15 accounts set up ... and each of them had a different amount for a different purpose .... [W]e were delivering feed to these different customers .... some of those funds had been earned already.

Q: By performance?

A: By performance.

Q: So you—in other words, to the extent that you delivered—your understanding was that to the extent you delivered grain, you earned the prepayment funds on an as-delivered basis.

A: As you delivered, right.

Eades Dep. at 57. Plaintiffs also argue a trust relationship existed because Eades returned prepayments to dairymen on two occasions. Eades Dep. at 113:17–115:25. Weststeyn Plaintiffs contend that a letter Mr. Eades wrote to Mr. David Andreas, the president of Diversified's sister company, National City Bank, evidences Eades' intent to place Plaintiffs' money in trust. The February 2000, letter provides, in part:

Eades Commodities Company customers presently have on deposit with Diversified Business Credit $1,583,886.16. These deposits are for the benefit of 30 dairy farmers in six states....

These deposits are not "proceeds of collateral," they are classified as "non-accounts receivables," they are reported to DBCI this way and DBCI requires us to maintain records separate from collateral accounts receivable. DBCI is refusing to release these deposits. Your bank has a fiduciary responsibility to return these funds.

Plaintiffs also point to Mr. Stan Lawrence's March 1, 2000, letter to a number of Plaintiffs as evidence that Eades intended each prepayment to be a trust account and not a debt. Mr. Lawrence, a Food Services' employee and Eades' agent, informed some Plaintiffs that "[t]he prepays represent 'trust' accounts that are not receivables until the product is shipped to and arrives on the dairyman's property." Weststeyn Dep. Ex. 10.

Plaintiffs' arguments are unconvincing. Mr. Eades' self-serving letters in February and March of 2000, made after the dispute arose are litigation posturing. Under California law, the parties' use of the word "trust" or the words "in trust" does not necessarily manifest an intent to create a trust relationship. *See Petherbridge,* 79 Cal.App.3d at 516, 145 Cal.Rptr. 87. Plaintiffs' testimony regarding Mr. Stan Lawrence and Mr. Creswick's use of the word "trust" is not evidence of a trust

because the contract of sale confirmation contains a clause that specifies no salesmen or brokers are empowered to enter into contracts to bind Eades. Mr. March's alleged implied statement to Mr. Herzog that the prepayment would be placed in a trust was made prior to the contract of sale confirmation and is overridden by the written contract which specifies:

This contract constitutes the entire understanding between the parties hereto and no modification or amendment of this Contract shall be valid or binding unless agreed to by both parties and confirmed in writing by either parties to the other. THERE ARE NO ORAL AGREEMENTS OR WARRANTIES COLLATERAL TO BE AFFECTING THIS CONTRACT. Buyer agrees to be bound by the terms of this contract in the event of any conflict in terms or conditions hereof with Buyer's contract for such purchase.

Mr. Eades' letter to Mr. Andreas states "the prepayment deposits are not 'proceeds of collateral' but are classified as 'non-accounts receivables,'" are legal conclusions expressed by a lay witness, which do not overcome summary judgment on the conversion and unjust enrichment claims. This is so because Eades' deposit and use of plaintiffs' prepayments to pay down its line of credit shows Eades did not intend to establish a trust relationship with the Plaintiffs, but rather to freely use those funds in Eades' business. Mr. Eades' testimony shows that he understood Eades earned the prepayments on an as-delivered basis for the fifteen plaintiffs' accounts related to the A.G. Edwards accounts.

There is no evidence that Eades routinely set aside prepayments in segregated accounts during the course of business with plaintiffs, nor did Eades treat or account for the prepayments as trust funds. Mr. Eades' understanding that Eades' in-come from the sales was earned on an as-delivered basis and Mr. Bettencourt's testimony that feed brokers should carry the prepaid feed expenses as an item of unearned income, deals with how prepayments should be treated for tax accounting purposes, not whether the transactions should be viewed as trusts. Mr. Bettencourt's opinion that the cash received by Eades created a trust relationship between Eades and each dairy is an inadmissible legal conclusion. *See Elsayed Mukhtar,* 299 F.3d at 1066, n. 10.

Parties create a trust where they manifest an intention to create a trust. As a feed broker, Eades' treatment of prepayments for feed on its books does not conclusively manifest the intent of the parties to create separate trust accounts on behalf of each Plaintiff. To the contrary, Mr. Eades testified that since 1989, Eades routinely commingled and turned over prepayment funds to Diversified. None of the Plaintiffs were a party to any written agreement requiring Eades to segregate funds or prohibiting Eades from commingling and using those funds. Where there is no agreement by the parties to segregate prepayments or to forbid the commingling of such prepayments with a party's general funds, such prepayments are not held in trust. *In re Coupon Clearing Serv.,* 113 F.3d 1091, 1101 (9th Cir.1997) (quoting *In re Black & Geddes, Inc.,* 35 B.R. 830, 836 (Bankr.S.D.N.Y.1984)) ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust relationship exists.").

■ As to unjust enrichment, Plaintiffs cannot dispute that Diversified loaned money (gave value) to Eades, which enabled Eades to keep doing business and to deliver feed to Plaintiffs. Diversified held a perfected prior security interest. Diver-

sified received no inequitable benefit. Rather, this is a dispute among creditors over the relative priority of their claims to some of Eades' remaining assets.

### 2. *A.G. Edwards Accounts*

▮ Plaintiffs argue that Eades' establishment of the A.G. Edwards accounts manifested Eades' intention to create a trust. Under California law, "where the owner of property declares that he holds it for the benefit of another, this may be sufficient manifestation of intention to create a trust .... although he does not use the word "trust."" *Maddox v. Rainoldi,* 163 Cal.App.2d 384, 388, 329 P.2d 599 (1958). Defendant contends that although six Plaintiffs' prepayments were briefly deposited in A.G. Edwards accounts, no trust relationship was intended. Both Mr. Eades and Elinor Greenfield, the A.G. Edwards employee who set up the accounts, testified that the "fbo" designation was for administrative convenience. Diversified argues that as a matter of law, an "fbo" designation is insufficient to transform deposits into trust funds, citing *Brucks v. Home Fed. Sav. & Loan,* 36 Cal.2d 845, 850, 228 P.2d 545 (1951).

▮ A tentative trust is formed when a person deposits money in trust for another person. "A deposit by one person of his own money in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the passbook or notice to the beneficiary." *Brucks,* 36 Cal.2d at 850, 228 P.2d 545. Here, Eades deposited six Plaintiffs' prepayments in separate A.G. Edwards money market accounts. The accounts were in Eades' name, not designated trust accounts and no trust documents were executed. No objective indicia

of a trust accompanied the deposits. While Mr. Eades testified that he segregated the accounts "to keep track and earn interest on it to pay what we promised to pay in the 7–percent range to the dairymen," he also testified that he could have placed the prepayments together in one account but decided to have separate accounts to keep track of the prepayment balances of each customer. Eades Dep. at 110, 56–58; Greenfield Dep. at 29.

Mr. Eades testified that A.G. Edwards accounts were established for customers in lieu of letters of credit because Diversified was unwilling to issue letters of credit to Eades' customers in January 2000. Eades' customers did not know about the A.G. Edwards accounts. When Diversified found out about the A.G. Edwards accounts and demanded money from the accounts, Eades immediately closed the accounts and transferred the money to Diversified for Eades' financial benefit. By closing the accounts and transferring the money to Diversified, any tentative trust that arose as a result of the establishment of the A.G. Edwards account was revoked by Eades, who never acted to make irrevocable any tentative trusts.

### 3. *Deduction of Prepayments on Tax Returns*

Diversified argues that Plaintiffs' deduction of the full amount of feed prepayments on their tax returns, affirmatively represented they were "irretrievably out of pocket" the amount of the prepayment for advance feed purchases and had made purchases. Diversified contends that under federal tax law, Plaintiffs could properly deduct prepayments as business expenses, only if the payments were for the *purchase* of feed, and not just deposits, citing *Commissioner of Internal Revenue v. Van Raden,* 650 F.2d 1046, 1048 (9th Cir.1981). Revenue Ruling 79–229, 1979–2

C.B. 210, 1979 WL 51094 (1979) permits "a cash-method taxpayer, engaged in the business of raising or feeding livestock [to] deduct in the year of payment amounts paid for livestock feed to be consumed in a subsequent year provided (1) the expenditure is for the purchase of feed rather than a deposit, (2) the prepayment is made for a business purpose and not for tax avoidance, and (3) the deduction will not result in a material distortion of income." Revenue Ruling 79–229 sets forth factors to consider when determining whether an expenditure is a purchase or a deposit:

> Whether a particular expenditure is a deposit or a payment depends on the facts and circumstances of each case. When it can be shown that the expenditure is not refundable and is made pursuant to an enforceable sales contract, it will not be considered a deposit. The following factors, although not all inclusive, are indicative of a deposit rather than a payment: the absence of specific quantity terms; the right to a refund of any unapplied payment credit at the termination of the contract ...; the treatment of the expenditure as a deposit by the seller; and the right to substitute other goods or products for the feed ingredients specified in the contract.

Diversified contends by deducting the prepayments, Plaintiffs acknowledged that they retained no interest in those funds. Diversified cites *Herrick v. State of California*, 149 Cal.App.3d 156, 159, 196 Cal. Rptr. 663 (1983) for the proposition that the tax advantage that state employees obtained when funds were removed from their salary and placed in a deferred compensation plan could not be held in trust because that would have defeated the purpose of the deferred compensation arrangement.

Plaintiffs argue their tax deduction of prepayments has no bearing on Plaintiffs' ownership interests in the prepaid funds. Plaintiffs cite *Energetics, Inc. v. Allied Bank of Texas*, 784 F.2d 1300, 1304 (5th Cir.1986) (applying Texas law recognizing an equitable exception for third party funds held in trust in a depositor's account to the bank's right of offset), as support that whether tax deductions are properly taken plays no part in determining ownership interests in prepaid funds. Because Diversified did not exercise any right of offset, but rather proceeded to enforce a perfected security interest in collateral pledged by Eades, the offset cases are inapplicable. Plaintiffs further argue Mr. TeVelde's testimony that the money was under his control and he had withdrawn it in the past, is indicative of the kind of control Plaintiffs had over the money entrusted to Eades. Even if this is true as to Mr. TeVelde, it does not apply to other plaintiffs.

The *Energetics* case is not helpful, as it deals with a bank's right of setoff, which is limited where the customer's account contains funds that belong to a person other than the customer which the bank knows are third-party funds, or the funds are held in trust by the customer for another period. Anderson on the Uniform Commercial Code § 4–303:25R (2002). Here, the bank exercised its security interest under a security agreement against the accounts receivable of Eades. The bank's security interest here extended to the collateral subject to the bank's security agreement included "receivables" which was defined as Eades' right to the payment of money, whether the right to payment exists or hereafter exists, whether arising out of a sale of goods, whether such right to payment of money is or is not already earned by performance.

Plaintiffs frivolously argue there is no evidence that they deducted deposits on their tax returns and spuriously contend their tax returns are privileged under California law and the privilege applies to both

state and federal tax returns. This is another red herring as any "privilege" yields when the item on a return is placed in dispute by the taxpayer. *Gattegno v. Pricewaterhousecoopers, LLP,* 205 F.R.D. 70, 72–3 (D.Conn.2001); *Terwilliger v. York Intern. Corp.,* 176 F.R.D. 214, 216 (W.D.Va.1997). Plaintiffs contend *Herrick* is distinguishable because this case involves prepayments for feed while *Herrick* deals with a deferred compensation plan.

▮ It is undisputed Plaintiffs deducted the prepayments for feed on their tax returns to receive the economic advantage of a tax deduction. The Scheduling Conference Order states:

> Each of the plaintiffs who prepaid funds to Eades did so for tax purposes because they deducted prepayments for the year 2000 on their 1999 tax returns. Some of the Plaintiffs protected against the credit risk of prepaying by requiring Eades to obtain a letter of credit up to the full or partial amount of the prepayment. All Plaintiffs that prepaid were to be compensated by Eades for the time value of their money, either by lower prices or feed credits.

Scheduling Conf. Order, Apr. 9, 2001, at 2, ¶ 2. Plaintiff Willy Creek's counsel admitted at oral argument that Willy Creek deducted the prepayments on its tax returns. The argument that the tax return "privilege" prevents analysis of a portion of the tax returns to prove that plaintiffs took the full amount of prepayments as business expense deductions from income is specious. It is well established that any tax return privilege is avoided when the nature of the underlying transactions is in dispute and there is no alternative source for the information. *Gattegno, supra,* at p. 73.

Two instances where Eades refunded prepayments to two customers upon their demand is evidence that in those circumstances Eades was willing to cancel the prepayments and return the funds to those customers.

It is factually and legally inconsistent for plaintiffs to argue that they did not make unconditional payments, yet took the benefit of tax deductions for feed prepayments, which are premised on law that requires the buyer to be "irretrievably out-of-pocket" for such feed prepayments. The tax law does not permit tax deductible feed prepayments to be refundable deposits. It is not reasonable to infer that plaintiffs were tax cheats or structuring illegal cattle feeding transactions for tax purposes to gain illegal tax benefits. Such conduct has potential criminal consequences where tax evasion is by use of knowingly false deductions from income to evade payment of taxes on all taxable income. The plaintiffs cannot have it both ways. The fact that letters of credit were taken down by some plaintiffs is persuasive evidence that plaintiffs knew their money was irrevocably at risk with Eades and they were dependent on Eades' continuing solvency to receive feed deliveries in the following year.

The fact of tax deductions for prepaid feed is strong evidence no deposit or express trust relationship, as opposed to a purchase and sale, existed between plaintiffs and Eades.

### 4. *Constructive Trust*

▮ A constructive trust remedy exists to prevent unjust enrichment realized through acts of wrongdoing. *See Martin v. Kehl,* 145 Cal.App.3d 228, 237, 193 Cal.Rptr. 312 (1983). Sections 2223 and 2224 of the California Civil Code define a constructive trust. *Communist Party of the United States v. 522 Valencia, Inc.,* 35 Cal.App.4th 980, 990, 41 Cal. Rptr.2d 618 (1995). Section 2223 provides: "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Section 2224 states: "One

who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." A constructive trust may be imposed where the court finds: (1) the existence of a res (property or some interest in property); (2) the right of a complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it. *Communist Party of United States*, 35 Cal.App.4th at 990, 41 Cal. Rptr.2d 618. The hallmark of a constructive trust is inequity by the trustee giving rise to imposition of the implied trust.

In *Chang v. Redding Bank of Commerce*, 29 Cal.App.4th 673, 35 Cal.Rptr.2d 64, 67 (1994), defendant bank setoff $200,000 against a debt owed the bank by a general contractor from the contractor's bank account. The contractor was constructing a hotel for plaintiff-owner. Plaintiff had paid the funds to the general contractor for the express contractual purpose of paying subcontractors. The general contractor deposited the plaintiff's money in its general business checking account. *Id.* Defendant bank exercised an offset based on a provision of its loan agreement with the general contractor which authorized offset in the event of a default. *Id.* After plaintiff-owner paid the subcontractors' mechanics' lien claims, he commenced an equitable subrogation action against the bank to recover the money seized by the bank, asserting the subcontractors' payment rights. *Id.* at 678, 35 Cal.Rptr.2d 64. The court held, "when the funds are trust funds and the bank knows or has knowledge of facts sufficient to put it on inquiry that the funds are held by the depositor in trust, the bank may not, as against the beneficiary, apply those funds to the depositor's individual indebtedness to the bank." *Id.* at 682, 35 Cal.Rptr.2d

64. There was nothing in the contract that suggested the general contractor was to act as a trustee for owner or was under the plaintiff-owner's control. Upon receipt from the owner, title to the funds vested in the general contractor. *Id.* However, because the underlying construction contract expressly provided that the general contractor was obligated to pay subcontractors out of the funds paid it by the owner, trust law applied to the contract to establish a trust as to the progress payment funds. The owner recovered such payments from the bank to prevent inequity where the bank had constructive knowledge that the owner's payments were special purpose funds intended for payment of subcontractors. *Id.* at 685, 35 Cal.Rptr.2d 64.

■ Plaintiffs argue they had "property interests" in the money Plaintiffs placed in prepayment accounts with Eades; that those funds "could only be used to pay for feed," and such funds are currently being wrongfully withheld by Diversified. Plaintiffs contend a constructive trust arises by virtue of their transfer of funds to Eades as "fiduciary" for them and Eades' wrongful transfer of Plaintiffs' property in breach of trust. Plaintiffs argue Eades' transfer of monies from Plaintiffs' accounts to Diversified breached this trust. Plaintiffs cite *Lucas v. Associacao Protectora Uniao Madeirense*, 61 Cal.App.2d 344, 351, 143 P.2d 53 (1943) which holds that where a trustee makes a transfer of property in breach of trust, a transferee who takes notice of the trust relationship, or who does not give value, is deemed a constructive trustee for the benefit of the rightful owner.

Diversified responds Plaintiffs have not established they had any further interest in the prepayment funds, once they were paid, to Eades. Diversified contends its perfected security interest gives it a supe-

rior interest in all collateral on proceeds held by Eades. Diversified contends there is no evidence Eades or Diversified fraudulently induced Plaintiffs to prepay for feed or used other wrongful means to obtain the unsecured prepayments. Diversified cites *In re North Am. Coin & Currency Ltd.*, 767 F.2d 1573 (9th Cir.1985) to support its position.

In *In re North American Coin,* former customers of an insolvent precious metals trader, who paid in advance for precious metals, sued a bankruptcy trustee to recover their funds from the bankruptcy estate. 767 F.2d at 1574. They claimed the trustee held the funds in constructive trust for them because the debtor obtained the money by fraud or misrepresentation. *Id.* Prior to the insolvency, the coin company created a bank account labeled "special trust account" into which the coin company deposited all customer payments from new transactions. *Id.* at 1575. The purpose of the account was to protect new customers in case the company did not survive and the trust account funds were not intended for use as operating money for the company. *Id.* If the coin company ceased operations, its principals, who devised the plan, anticipated that the customers would get their money back. *Id.* The customers never received the precious metals they ordered. *Id.* The court declined to impose a constructive trust because the evidence did not establish fraud. *Id.* at 1576. The court found the company did not commit fraud when it accepted new orders during the last week of its existence. *Id.*

Here, the evidence does not support the imposition of a constructive trust on the theory plaintiffs continued to own the prepayments; they did not. The contracts provide no limitation on how Eades could utilize feed prepayments, did not require segregated accounts, or otherwise did not reserve ownership in such prepayments to Plaintiffs. Plaintiffs have not shown Di-

versified wrongfully acquired or detained the prepayments owned by Plaintiffs by enforcing its prior valid security interest in Eades' accounts. *Chang* is distinguishable. There, the construction contract provided that the general contractor was to specifically pay the subcontractors out of the amount paid to the general contractor by plaintiff-owner and the bank had notice or reason to know of such payment requirements. Here, each feed purchase contract is silent. Diversified advanced loan funds to Eades to continue conduct of Eades' business, which was to Plaintiffs' business advantage. Eades was free to and did commingle Plaintiffs' prepayments with Eades' general funds; it regularly used the prepayments in the ordinary course of business; and transferred the prepayments to Diversified to pay down Eades' line of credit. *In re North American Coin* suggests that a constructive trust will not be imposed where a company did not know it would be insolvent, even if it earmarked and segregated customer prepayments in a special trust bank account, for the purpose of ensuring customers would get their money back if the company ceased operations. Concomitantly, though Eades segregated some Plaintiffs' prepayments in A.G. Edwards accounts, Eades did not notify Plaintiffs it did so, nor did Eades know it would be insolvent at the time it transferred the account funds to Diversified.

The evidence does not support imposition of a constructive trust. Although Diversified had knowledge that prepayments were made to Eades by customers, Eades dealt with such funds as its own in the ordinary course of business and transferred prepayment funds to Diversified to keep its financing from being declared in default. Summary adjudication for Diversified is appropriate.

### 5. Resulting Trust

■ Plaintiffs argue that a resulting trust should be imposed if their express trust argument fails. Under California law, "a resulting trust is a trust implied by operation of law to enforce the inferred intent of the parties to establish a trust." *In re Golden Triangle Capital*, 171 B.R. 79, 82 (9th Cir.BAP 1994). A resulting trust is inapplicable because the evidence does not show the parties unequivocally intended to establish a trust for all the reasons discussed above, except as to those Plaintiffs who may be able to establish an express trust.

### 6. Perfected Security Interest Priority

A security interest is enforceable if: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured third party; and (3) there is evidence that the debtor intended to pledge the collateral through one of a variety of methods, but generally through execution of a security agreement. Cal. Comm.Code § 9203(b). The Security Agreement with Eades defines Diversified's security interest in receivables as "each and every right of borrowers to the payment of money ... whether such right to prepayment is or is not already earned by performance." The Security Agreement provides: "Except to the extent otherwise required by law, this Agreement and the transactions evidenced hereby shall be governed by the substantive laws of the State in which this Agreement is accepted by Lender."[2] Under California law, "account receivable" means "account" as defined in paragraph (2) of subdivision (a) of Section 9102 of the Commercial Code. Cal. Civ. P. § 481.030 (2002). An "account ... means a right to payment of a monetary obligation, whether or not earned by performance, (i) for prop-

erty that had been or is to be sold...." Cal. Comm.Code § 9102(a)(2)(2002). Prior to July 21, 2000, California law defined "account" as any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. *See* Cal. Comm.Code § 9106 (2000). Under either definition the prepayments appear to be "accounts," as a monetary obligation unearned by performance or right to payment for goods sold not evidenced by an instrument or chattel paper, nor earned by performance.

Diversified argues it held a prior perfected security interest in all Eades' assets including receivables and general intangibles pursuant to the Security Agreement, which extended to the prepayments Eades received, even if Eades had not delivered all the feed for which Plaintiffs prepaid. Alternatively, if the prepayment funds are not classified as "accounts," they are "general intangibles" which are covered by the Security Agreement. *In re Coupon Clearing Service* defines general intangibles as "any other rights to payment, whether earned or not yet earned, to the extent that they arise other than from goods sold or leased or from services rendered, would not constitute accounts, but general intangibles." *In re Coupon Clearing Service*, 113 F.3d 1091, 1102 (9th Cir.1997). The prepayments arose from the sale of goods to be delivered in the future and are accounts.

Plaintiffs rejoin Diversified's security interest never attached because Eades had no rights in the prepayments. Mr. Bettencourt opines that in the agricultural industry "as product is shipped, and only then, the broker should make the appropriate accounting entry to show that the

---

**2.** The parties agree that the substantive law of the State of California provides the rule of

decision in this case. *See* Doc. 33, Sched. Conf. Order, Apr. 9, 2001, at VI(A)(3).

income has been earned." He further opines that prepays are not accounts receivable because prepayments are a credit balance not a debit balance; thus, prepayments are not covered by the Security Agreement. These are legal opinions disguised in accounting parlance. Except for accounting treatment, the opinions are inadmissible legal conclusions and not helpful to the trier of fact. *See* Fed.R.Evid. 702.

Plaintiffs further argue Eades did not intend to pledge the prepayments as collateral. Willy Creek, which filed its case after July 1, 2001, contends Section 9102(a)(2)(vi) explicitly provides that the term "account" does not include rights to payment for money or funds advanced or sold. Willy Creek's argument that Section 9102(a)(2)(vi) explicitly provides that the term "account" does not include rights to payment for money or funds advanced or sold is flawed, because the "rights to payment for money or funds advanced or sold" refers to Eades' right to payment for money or funds, not Plaintiffs' rights to payment for money or funds from Eades. The payments were made for feed (goods) sold and delivered or to be delivered in the future.

■ Mr. Bettencourt's opinion that the prepayments are not accounts receivable is an inadmissible legal conclusion entitled to no weight. Accountants are not competent to give legal opinions about interpretation of the Uniform Commercial Code. The evidence establishes Diversified had a prior perfected security interest in Plaintiffs' prepayments as the funds were received by Eades and deposited into Eades' accounts, under the Security Agreement. Paragraph 3 of the Security Agreement defines Diversified's security interest in receivables as "each and every right of borrowers to the payment of money ... whether such right to prepayment is or is not already earned by performance." Diversified's security interest is enforceable because (1) value was given, i.e., it refrained from terminating Eades' line of credit or declaring default in the loans for insecurity and loaned more money to Eades; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured third party, i.e., Eades had the funds in its own bank accounts or its accounts at A.G. Edwards, or paid the funds to Diversified to reduce Eades' loan balances; and (3) there is evidence that the debtor (Eades) intended to pledge the collateral under the terms of the security agreement.

Value was given when Diversified advanced money to Eades. Eades was prepaid for cattle feed by each Plaintiff and in return delivered or promised to deliver feed on each Plaintiffs' demand. Eades had rights in and in fact dealt with the collateral, the prepayments, as its own, because it was not prohibited from commingling the prepayments with its general business account or from using the prepayments in the conduct of Eades' business. Eades regularly commingled the prepayment funds and used such prepayments to pay down its line of credit and for other purposes. This course of dealing shows Eades understood the prepayments were its accounts because the prepayments were for goods; to wit, cattle feed sold and delivered or to be delivered. All Eades' bank and investment accounts were subject to the Security Agreement. Although Eades was not consistent in reporting its prepayments in collection reports to Diversified, there is no dispute Eades transferred prepayments to Diversified as debt service to pay down Eades' line of credit.

Diversified's security interest was perfected through the filing of various financing statements of record which gave Plaintiffs notice of Diversified's rights. *Cassel v. Kolb,* 72 Cal.App.4th 568, 575, 84 Cal.

Rptr.2d 878 (1999). Plaintiffs did not take a security interest in Eades' assets, nor did they take steps to segregate and preserve their prepayments in separate trust accounts, nor did they arrange for letters of credit to assure the prepayment performance obligation. As general unsecured creditors, they stand behind Diversified, which holds a prior perfected security interest in these prepayments.

Plaintiffs contend equitable principles can serve to override Diversified's claim of priority under the Uniform Commercial Code priority scheme. Plaintiffs cite *Knox v. Phoenix Leasing, Inc.*, 29 Cal.App.4th 1357, 35 Cal.Rptr.2d 141 (1994), arguing California law allows restitution from a creditor with a perfected security interest. Plaintiffs also argue Diversified's decision to foreclose its security interests after Eades received a large influx of prepayments in December 1999 was in bad faith.

■ *Knox* interprets *Producers Cotton Oil Co. v. Amstar Corp.* 197 Cal.App.3d 638, 242 Cal.Rptr. 914 (1988) to permit restitution, "[W]hen an unsecured creditor provides goods or services that are necessary to preserve the collateral, this is an expense the secured creditor would ordinarily incur as part of the duty to use 'reasonable care in the custody and preservation of collateral in his possession.'" *Id.* at 1366. *Knox's* interpretation of *Producers Cotton* was unnecessary to the decision and is dicta. That dicta is inapplicable to this case because Plaintiffs, as unsecured creditors, did not provide goods or services that were necessary to preserve the collateral. The prepayments for feed were the collateral, once received by Eades. Nor did Plaintiffs pay their funds with intent and knowledge that the payments would be used to persuade Diversified to keep Eades in business. To the contrary, the payments were solely for Plaintiffs' benefit, to buy feed and obtain tax deductions, prior supply, and favorable prices. While

the timing of Diversified's decision to foreclose is suspicious, the Security Agreement provides "all loans which Lender may determine to make under this Agreement shall be repayable on demand." A creditor's insisting on payment under an express legal right, even if in bad faith, is not actionable. *Kruse v. Bank of America*, 202 Cal.App.3d 38, 68, 248 Cal.Rptr. 217 (1998). Plaintiffs do not show equities that override Diversified's claim of priority as a perfected secured creditor under the UCC priority scheme.

C. *Intentional Interference with Contractual Relations*

■ To establish intentional interference with contractual relations, a plaintiff must prove: (1) the existence of a valid contract or other economic relationship between Plaintiff and a third party; (2) Defendant's knowledge of that relationship; (3) intentional acts on the part of the Defendant designed to induce a breach or disruption of the contractual relationship; and (5) resulting damages. *Quelimane Co. Inc. v. Stewart Title Guar. Co.*, 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998). "Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." *Id.* (citations omitted). "[T]he tort of intentional interference with performance of a contract does not require that the actor's primary purpose be disruption of the contract." *Id.*

The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but

is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

*Id.* (citing Rest.2d Torts, § 766, com. j at p. 12.).

■■■ Diversified argues it had no knowledge of a specific contract between Eades and its customers. Defendant contends even if it had such information, it never seized any prepayment funds but merely demanded and accepted Eades' payment of such funds pursuant to its rights under Security Agreement. Diversified argues to the extent Plaintiffs wished to avoid Eades' loan repayment to Diversified as "preferential," their recourse was to initiate an involuntary bankruptcy petition pursuant to 11 U.S.C. § 303.

In opposition, Plaintiffs argue the deposition testimony of Mr. Tomaszek, former vice president of operations at Diversified, shows Diversified knew of the contracts between Eades and its customers. Mr. Tomaszek testified that Eades received approximately one to two million dollars in deposits from its customers; that "[a]n invoice or sales journal ... would be received by Diversified and attached to an assignment report" each time Eades Commodities made shipments of grain charged against Plaintiffs' prepaid accounts; and that he wrote letters to Eades' customers regarding money the customers allegedly owed Eades. Tomaszek Dep. at 22, Ex. 1; 116–20; 117–18. Plaintiffs argue Diversified's acts of conversion of the prepayment funds gave rise to a substantial certainty that the interference with contract would occur and supports an inference of intent to interfere on the part of Diversified.

That Diversified was a competing creditor, seeking to enforce its security interest in Eades' accounts gave Diversified a privilege to protect its economic interests, that validates intentional acts designed to disrupt Plaintiffs' relationship with Eades. *See Webber v. Inland Empire Investments,* 74 Cal.App.4th 884, 902, 88 Cal. Rptr.2d 594 (1999) (creditor entitled to take all legal steps to obtain payment of debt owed to it). While the evidence supports Plaintiffs' contention that Diversified knew of the contracts between Eades and Plaintiffs, evidence that Diversified lawfully demanded Eades pay-over accounts, which were collateral under the security agreement to enforce its security interests, such conduct, authorized by the security agreement, negates the argument Diversified wrongfully intended to disrupt and did disrupt Eades' relationship with Plaintiffs. The defense of economic privilege or justification applies. Diversified was entitled to seek and obtain the prepayments under the terms of its Security Agreement. The fact that Diversified knew such seizure would interfere with Plaintiffs' contracts "may be regarded as such a minor and incidental consequence and so far removed from defendant's objective that as against the plaintiff the interference may be found not to be improper." *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal.4th 26, 56, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998). Diversified's motion for summary judgment as to the intentional interference with contractual relations claim is GRANTED.

D. *Intentional and Negligent Interference with Prospective Economic Advantage*

■■■ "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some

measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 392–93, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). In contrast, negligent interference may be asserted only where the defendant owes the plaintiff a duty of care. *Lange v. TIG Ins. Co.*, 68 Cal.App.4th 1179, 1187, 81 Cal.Rptr.2d 39 (1998). "For negligent interference, a defendant's conduct is blameworthy only if it was independently wrongful apart from the interference itself." *Id.*

██ Diversified argues the exercise of its contractual rights does not constitute wrongful conduct under both the intentional and negligent interference claims, citing *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal.App.4th 464, 475, 54 Cal.Rptr.2d 888 (1996) and *Lange*, 68 Cal.App.4th at 1188–89, 81 Cal.Rptr.2d 39. In opposition, Weststeyn Plaintiffs contend Diversified engaged in conduct independently wrongful of its interference with Plaintiffs' economic relationship with Eades and other vendors by converting the funds meant to further those relationships. Weststeyn Plaintiffs argue that Diversified's exertion of control and dominion over, and ultimate conversion of, Plaintiffs' funds held in trust was wrongful and not an exercise of rights given to them by any contract or security agreement. As to their negligent interference claim, Weststeyn Plaintiffs assert Diversified had a duty of care to Plaintiffs because it engaged in acts of conversion that were independently wrongful and grounds for liability notwithstanding the actual interference. Willy Creek does not address the intentional and negligent interference with prospective economic advantage claims, because it does not allege these two claims in its complaint.

The evidence does not support Plaintiffs' claim that Diversified wrongfully took prepayment funds held in trust by Eades for Plaintiffs' benefits. As discussed above, the Security Agreement applied to the prepayments, which were collateral in the form of accounts to which Diversified perfected security interest attached. Diversified had an express contractual right to enforce against Eades its security interest in the prepayments. Diversified's motion for summary judgment as to the intentional and negligent interference with prospective economic advantage claims are GRANTED.

### E. *Declaratory Relief*

██ Plaintiffs seek declaratory relief as to the respective rights of the parties. Section 1060 of the California Code of Civil Procedure, permits a plaintiff to "ask for a declaration of rights or duties, either alone or with other relief ... whether or not further relief is or could be claimed at the time." Section 1062 provides: "The remedies provided by this chapter are cumulative, and shall not be construed as restricting any remedy, provisional or otherwise, provided by law for the benefit of any party to such action, and no judgment under this chapter shall preclude any party from obtaining additional relief based upon the same facts."

Plaintiffs do not have a contract with Diversified. They have no continuing relationship with Eades or Diversified that requires definition. They do not show that declaratory relief would be different from the rights that will be determined by decision on their substantive claims and entitlement to money damages, the ultimate remedy they seek. Plaintiffs do not establish what rights and duties need to be declared that will not be resolved by their other claims. Defendant is entitled to summary judgment on the declaratory relief claim.

### V. CONCLUSION

For all the reasons above, the following motions for summary judgment as to the following Plaintiffs are granted:

### 1. *Alamo Dairy*

Alamo Dairy took a tax deduction for prepaid feed in the year of payment. Alamo dealt only with Mr. Creswick, a broker. No discussion about any trust or other "deposit" arrangement arose before this controversy was actuated by Eades' bankruptcy. There were no prior representations that prepayments would be held in trust or segregated in any way.

### 2. *Vista Livestock*

Vista Livestock deducted full amount of prepayments as a business expense for tax purposes. Vista received a fixed $3.00 per ton discount on all prepaid feed. Vista dealt only with the broker, Mr. Lawrence. There was never any discussion about a trust or what would be done with Vista's prepayments.

### 3. *Tony Garcia Dairy*

Mr. Garcia dealt only with broker, Stan Lawrence. Garcia Dairy took full expense deductions for all prepayments for tax purposes. Garcia Dairy was paid 7% interest on all prepayments. A trust was never discussed nor was there any discussion about where prepayments would be held or that prepayments would be segregated.

### 4. *Sleepy Hollow Certified Milk Co.*

Sleepy Hollow prepaid for feed for the 1999–2000 year. Mr. Herzog of Sleepy Hollow spoke to Mr. March, a broker. Mr. March explained there would be no invoice for an expense until feed was delivered. He had no recall the word "trust" was used. It was "implied" money was going into a trust. The name A.G. Edwards was mentioned but Mr. Herzog had no recollection about that firm or the reason it was mentioned. Mr. Herzog dealt with Mr. Lawrence, a broker. He was not told prepayments would be held in a segregated account with A.G. Edwards or any other financial institution. He was never told the prepayments would not be used to pay the business expenses of Eades, although Mr. Herzog "assumed it."

### 5. Willy Creek Ranch:

Mr. Jongsma of Willy Creek Ranch starting in 1994 and 1995, annually purchased prepaid feed. Willy Creek earned 7% interest on the amount of the prepayment. Mr. Jongsma had a conversation with Mr. Eades apparently in December of 1999 for delivery of feed into 2000. Under a "verbal agreement" Mr. Jongsma understood the payments were "refundable deposits, like depositing money in a bank." The word trust was never mentioned. Mr. Eades told him that money would only be taken out of the "refundable deposit" once feed was shipped. There was no discussion about whether Eades' business expenses would be paid from the refundable deposit. Mr. Jongsma was never told that the money would be segregated in a separate account by a financial institution, nor was A.G. Edwards ever discussed.

### 6. *Larrybell Dairy & Sons*

Mr. Lawrence of Larrybell dealt with broker, Mr. Stan Lawrence. Mr. Lawrence hand delivered prepayment checks to Mr. Stan Lawrence for Eades. Larrybell Dairy deducted their prepayments as expense deductions for tax purposes. They were paid 7% interest and received a fixed price per ton on the prepayment. Mr. Larry Lawrence understood that "my money was my money" "that's why I'm getting 7% interest because my money is in the holding account where I can get my interest back every month." Mr. Lawrence understood as feed invoices came in, the amounts would be deducted from his monies at the bank. There was no discussion that Larrybell Dairy payments would be held in a segregated account or an account with A.G. Edwards or with any

other financial institution. In the first year of dealings, Larrybell Dairy used a letter of credit. Mr. Lawrence stated that after the first year "I took a gamble that I wouldn't need it. I lost."

### 7. *B & J Dairy*

Mr. Pellandini prepaid in 1999 to lock in price and supply; deducted prepayments on its income tax returns; and received interest from Eades in prepayments. B & J Dairy chose not to obtain a letter of credit assuming Eades was a solid business. Mr. Pellandini spoke with broker, Mr. Creswick. He could not remember what Mr. Creswick said except "You can repay if you want to." Mr. Creswick told him the prepayment was not used until you take the feed. Mr. Pellandini could not remember the word "trust" being used. He understood the prepayment was like a receivable balance, i.e., "it wasn't their money until they brought the feed." Mr. Pellandini was not told Eades would not use the prepayments to pay Eades' business expenses, but that it was not Eades' money until the feed was delivered. Mr. Pellandini could not recall whether he was told prepayments would be held separately at another financial institution. He had no knowledge of an account at A.G. Edwards. B & J's bookkeeper, Sandra Pellandini, was never told anything about a trust or that the money would not be used to pay business expenses or that the money would ever be segregated, nor had she ever heard of A.G. Edwards.

### 8. *Western Sky Dairy*

George Plantenga spoke with Mark Pate, representing Eades. Western Sky made feed prepayments every year, starting in 1989 through 1999, except 1997. Each year expense deductions for prepay-

ments were taken on tax returns, and a fixed price per ton was set for the feed. There was no discussion of a security agreement or financing statement. Discussions primarily centered on price. There was no discussion about a trust. There was no promise that Eades would not use prepayments to pay Eades' business expenses or that the money would not be pledged as security for a loan. A.G. Edwards was never discussed, nor was there any discussion about what Eades would do with the money once Eades received it.

### 9. *George TeVelde Dairy*

George TeVelde Dairy made prepayments, took prepayments as expense deductions on income tax returns, was paid interest, and received a fixed price for feed. Mr. TeVelde dealt primarily with Mr. Creswick, and also talked to Mr. Eades. There were no discussions of substance before the year 2000. No one ever told Mr. TeVelde that the prepayments would be held in trust. Mr. TeVelde understood he could withdraw the money at any time, which he once did at Davis Commodities in August of 1999. The subject of a trust was never discussed. There was no discussion that Eades would not use the prepayments to pay Eades' business expenses. Mr. TeVelde was paid 7% interest. There was never discussion about a separate account, nor was an A.G. Edwards account nor any other financial institution account ever discussed. Mr. TeVelde was not told that he had any other control over the prepayments. Mr. TeVelde did not view the money as on deposit with Eades, but similar to a bank deposit. He understood this because he took a full expense for the prepayment when it was paid. The TeVelde Dairy did not have a letter of credit.

### 10. *Van Steyn Dairy*

Van Steyn Dairy made prepayments for seven or eight years. It took tax deductions for the full amount of prepayments as business expenses, and obtained a fixed price per ton and guaranteed supply of feed. The letter of credit was discussed, but Van Steyn Dairy did not obtain a letter of credit after the first year of dealing. There was no discussion about a trust arrangement. Mr. Van Steyn understood that his money would be kept in a separate account and that it was his money. As product was delivered, invoices would be written deducting that amount from the prepayment total. The prepayments were to be kept separate from everybody else's money, but Mr. Van Steyn was not told what Eades would do with the payments. There was no mention that prepayments would be placed in a segregated account with A.G. Edwards or any other financial institution. Mr. Van Steyn could not state under oath he was told the money would be placed in trust. He was never told that Eades would not use prepayments to pay other expenses of Eades. He had no knowledge of A.G. Edwards deposits or withdrawal of funds from A.G. Edwards. In his testimony, Mr. Van Steyn assumed that his money was in some kind of a "trust account," but he could not testify the word "trust" was used.

### 11. *Van Warmerdam Dairy*

Van Warmerdam Dairy did business with Eades for three to four years. It deducted all prepayments as expense deductions on its income tax return. It also sought to obtain a fixed price and assured quantity of feed. Mr. Van Warmerdam never discussed obtaining a letter of credit. The subject of a trust was never discussed. There was no discussion as to what use Eades would make of the prepayments or whether it would not use prepay-

ments to pay other business expenses. There was no discussion of an A.G. Edwards account, any other financial institution account, or that prepayments would be segregated.

### 12. *Weststeyn Dairy*

Weststeyn Dairy made feed prepayments in four years, 1996 to 1999. An expense deduction was taken for income tax purposes. Prepayments were made to guarantee supply of product at a guaranteed price. Interest was paid to Weststeyn by Eades on the prepayments. A trust was never discussed. Mr. Weststeyn understood that the prepayments were to be held in a separate account. If product was shipped, the amount of prepayment was reduced. Mr. Weststeyn "assumed" the money would be held in trust and was not going to be used to pay other people. However, no one from Eades ever stated what Eades did with prepayment money once it was received, where it was deposited, or what use was made of it. There was no discussion about A.G. Edwards or any other financial institution. There was no discussion of a separate account with A.G. Edwards or any other financial institution. The word trust account was not used until after Eades' insolvency.

### 13. *Marchy & Sons Dairy*

Marchy & Sons only did business with Eades in 1999. It deducted its prepayments as business expenses on tax returns for 1999. It was paid interest on prepayments, which locked in an assured feed supply. No mention of trust or trust accounts was made before March of 2000 after Eades' insolvency. Mr. Marchy dealt only with Mr. Creswick, a broker for Eades. Mr. Creswick never told Mr. Marchy that prepayments would be segre-

gated or held in a separate account with A.G. Edwards or any other financial institution. Mr. Creswick did mention in the last week of 1999 that prepayments would be held in trust. Mr. Marchy never obtained a letter of credit nor took any steps to obtain the prepayments.

### 14. *J. M. Bettencourt Dairy*

Mr. Bettencourt was never told any prepayments would be held in trust, nor was there any discussion about a segregated account or earmarking prepayments. Eades' representative never said there would be any limit on how Eades would use the funds it was paid. Tax deductions were taken and interest paid to Bettencourt Dairy.

As to all plaintiffs, defendants' motions for summary judgment as to conversion, intentional interference with contractual relations and negligent interference with prospective economic advantage are GRANTED. The defendants' motion for summary judgment for declaratory relief claim as to all plaintiffs is GRANTED.

Defendant Diversified shall within five (5) days following date of service of this memorandum decision, submit a judgment in conformity with this decision.

SO ORDERED.